84

T. J. STEVENSON & CO., INC., Plaintiff
& Counterclaimant,

v.

81,193 BAGS OF FLOUR, etc.,
Defendant,

v.

ADM MILLING CO., INC., Defendant
as to Counterclaim.

ADM MILLING CO., INC., Defendant,
Counterclaimant and Third-Party
Plaintiff,

v.

T. J. STEVENSON & CO., INC. and MV
NEDON, etc., Defendants as to Coun-
terclaim of ADM Milling Co., Inc.

REPUBLIC OF BOLIVIA, MINISTRY OF
INDUSTRY, COMMERCE AND TOUR-
ISM, Third-Party Defendant as to Coun-
terclaim of ADM Milling Co., Inc.,

Republic of Bolivia, etc., Counterclaimant
and Cross-Plaintiff,

v.

ADM MILLING CO., INC., Defendant as
to Counterclaim of Republic of
Bolivia, etc.,

T. J. Stevenson & Co., Inc., Cross-Defend-
ant as to Cross-Complaint of
Republic of Bolivia, etc.

Civ. A. No. 74–501–T.

United States District Court,
S. D. Alabama, S. D.

Sept. 16, 1976.
As Amended Dec. 30, 1976.

See also, D.C., 399 F.Supp. 936.

George F. Wood and Sidney H. Schell, Mobile, Ala., for plaintiff.

Alex T. Howard, Jr. and Thomas S. Rue, Mobile, Ala., William R. Joyce, Jr., Washington, D. C., for Republic of Bolivia Ministry of Industry, Commerce & Tourism.

Rae M. Crowe and G. V. Parker, Mobile, Ala., Peter D. Trooboff, Covington & Burling, Washington, D. C., for defendant ADM Milling Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL HOLCOMBE THOMAS, Senior District Judge.

The above-styled cause was heard by the Court without a jury and taken under submission on the 20th day of July 1976. After hearing the evidence for some twenty-five days, examining the exhibits, pleadings and stipulations, and having considered the arguments and proposed findings of fact and conclusions of law of counsel of all parties, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The plaintiff herein, T. J. Stevenson & Company, Inc. (Stevenson) is a corporation organized under the laws of the State of New York and is engaged generally in the steamship business. Stevenson was, at all material times, the owner of the vessels SOUTHWALL and ARIZONA and was the time charterer of the M/V NEDON.

2. ADM Milling Company, Inc. (ADM), claimant and counter-claimant, in the above-styled cause, is a corporation organized and existing under the laws of the State of Illinois, having its principal place of business in Shawnee Mission, Kansas. ADM was, at all material times, engaged in the business of the milling of wheat into flour.

3. The Ministry of Industry, Commerce and Tourism is an agency or branch of the Government of the Republic of Bolivia (hereinafter referred to as the Ministry of Bolivia) having its principal offices in La Paz, Bolivia.

## HISTORY OF A LAWSUIT

4. In the spring of 1974, the South American country of Bolivia sought to purchase wheat flour in the American market for the purpose of supplying the bread demand of her population. Therefore, the Bolivian government authorized and funded Heran Landivar, Sub-secretary of the Ministry of Industry, Commerce and Tourism of the Republic of Bolivia to obtain such a purchase. Prior to departing for the United States, Landivar called upon the American Ambassador in La Paz, Bolivia, and asked him for assistance in making the necessary purchase of flour. As a result of the sub-secretary's request, the State Department of the United States provided him with an audience in Washington.

5. Subsequently on his arrival in Washington, Landivar attended the meeting at the State Department with Bolivian Ambassador Valencia wherein Landivar sought to obtain information for purchasing flour, lard and oil. An appointment with the United States Department of Agriculture (USDA) was scheduled for the sub-secre-

tary the following day; however, as Landivar was unable to attend, he delegated the authority to purchase flour for the Ministry to Dr. Juan Loria, at that time a minister with and later Chargé d'Affaires of the Bolivian Embassy in Washington, D. C. Following the instructions of the Ministry, Dr. Loria contacted ADM, one of the milling companies recommended by the USDA wherein Bolivia entered into two contracts of purchase and sale with ADM for the delivery of wheat flour.

## THE FLOUR CONTRACTS

6. On April 11, 1974, the first contract of sale was entered into between Bolivia and ADM. (ADM Ex. 26B, Bol. Ex. 10)[1] Under such contract 20,000 metric tons of ADM hard winter wheat flour were to be delivered F.A.S. Mobile, Alabama, for export between June 1 and September 10, 1974. The price was $230.88 per ton payable by irrevocable letter of credit. (Bol. Ex. 10) Having entered into this first contract with ADM, Dr. Loria reported this information to Landivar who subsequently authorized the purchase of an additional 8,618 metric tons of flour.

7. On April 15, 1974, a second contract was entered into, (ADM Ex. 26A, Bol. Ex. 11) the terms of which, excluding quantity, price and delivery date, are the same as the first contract. Bolivia required all flour to be shipped in cotton bags. Under the second contract, 8,618 metric tons were to be delivered F.A.S. Mobile, Alabama, for export during April/May, 1974, at a price of $235.95 per metric ton. (ADM Ex. 26A, Bol. Ex. 11)

The total amount of flour purchased by Bolivia in both contracts was to be transported from Mobile in eight shiploads, hereinafter referred to as liftings. With some minor exceptions and notwithstanding the normal torn, wet and short bags of flour which generally occur on ocean voyages, the first five liftings of flour were properly received by Bolivia by September 1, 1974. The heart of this litigation concerns the problems surrounding the sixth, seventh and eighth liftings, caused by insect infestation.

## CONTRACT SPECIFICATIONS

8. Both contracts contained specifications as to protein, ash and moisture content.[2] Moreover, on the front page of each contract between ADM and the Ministry, the following provision appears:

Except as provided on the reverse side, SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, THAT EXTENDS BEYOND THE DESCRIPTION ON THE FACE HEREOF, except that the product sold hereunder shall be of merchantable quality. . . . (Bol. Exs. 10, 11)[3]

1. References preceded by "ADM Ex.", "Bol. Ex." or "TJS Ex." are to the exhibits admitted into evidence during the trial on behalf of ADM Milling Company, Inc., the Republic of Bolivia and T. J. Stevenson & Company, respectively. See Appendix A for an alphabetical listing and identity of the parties and entities mentioned throughout the course of this opinion.

2. The specifications contained in each contract are as follows:
   ADM—72% Extraction
   Hard Winter Wheat Flour
   Min. Protein 10.0%
   Max. Ash—.50%
   Moisture—14%

3. Terms of each contract on the reverse side of the page which are of special importance to the issues in this cause read in pertinent part as follows:
   SHIPMENTS: Delivery of goods by SELLER to the carrier at point of shipment shall constitute delivery to BUYER, subject to the lien of SELLER for the unpaid purchase price. BUYER shall furnish SELLER complete shipping instructions . . . and at least ten (10) days before the requested time of shipment. If there is more than one installment of goods shipped or stipulated herein to be shipped, this contract shall be construed to be severable as to each installment, except where such construction would be in direct conflict with the provisions hereinafter set forth under "RIGHTS OF BUYER" and "RIGHTS OF SELLER", and breach or default of either BUYER or SELLER as to any installment or installments shall not give the other party a right to cancel this contract, except as herein otherwise provided . . .
   WARRANTY: SELLER expressly warrants that any goods contracted for herein will be representative of the brand or grade specified herein to be sold, and will comply with all of the applicable provisions of the Federal Food,

## THE IRREVOCABLE LETTERS OF CREDIT

9. Pursuant to its contracts with ADM, Bolivia opened two irrevocable letters of credit through its local bank Banco Central de Bolivia, La Paz, Bolivia, the correspondent bank of which was the First National City Bank, New York, New York. The first letter of credit No. 9090 (ADM Ex. 13, Bol. Ex. 26) was opened on April 18, 1974, in the favor of ADM securing the purchase price of the flour for sums not exceeding a total of U.S. $6,651,017.10, F.A.S. Mobile, Alabama. In addition, the letter of credit was payable on sight if accompanied by (1) commercial invoice with a price F.A.S., legalized by Bolivian Consulate, pertaining to 28,618 metric tons of flour; (2) Bolivian Consulate invoice; and (3) a certificate of quality.[4]

10. This letter of credit was amended several times concerning the percentage of protein, the changing of the shipping schedule and the markings on the bags of flour.

11. In order to transport 28,618 tons of flour to South America, the Bolivian Embassy engaged the services of St. John International, Inc. (St. John), a shipping broker, which had been the agents for the Bolivian Government in the past with regard to U. S. Public Law 480 shipments, commonly referred to as the Agricultural Aid Program. St. John's primary responsibility was to coordinate the shipping program for the arrival of ships in Mobile and to arrange for the vessels to carry the flour to either Arica or Antofagasta, Chile.

12. Bolivia is a land-locked country and therefore, goods imported by sea must come through a neighboring coastal country. Bolivia asserts that she has a treaty[5] with Chile governing the Port of Arica and that this treaty allows for the free importation of goods to Bolivia. In the instant case, most of the flour liftings were to be shipped through Arica. Upon arrival in Arica, the flour was to be transported to Bolivia by rail. At times, the port of Arica is subjected to congestion because of the limited rail facilities. Railroad capacity from Arica to La Paz is approximately 300–350 tons per day.

Drug and Cosmetic Act and of any applicable State Pure Food and Drug Act. BUYER hereby waives any claim or defense based on the quality of the goods specified herein, unless (1) within ten (10) days after BUYER learns by use or otherwise of the defect complained of, but in any event within twenty (20) days after receipt of notice of arrival of said goods at destination, BUYER sends SELLER at SELLER'S main office a letter by registered mail specifying the nature of the complaint and (2) within said twenty (20) days send by parcel post or express prepaid to SELLER'S said office a five (5) pound sample of the goods alleged to be defective or inferior . . .
RIGHTS OF BUYER: . . . Failure on the part of SELLER to deliver, or non-conformity of, any installment of this contract shall not be a breach of the entire contract.
RIGHTS OF SELLER: . . . or if BUYER shall fail to make any payment to SELLER when due under this or any other contract between BUYER and SELLER . . .
SELLER may by written notice sent by registered mail to BUYER at BUYER'S main office: . . .
(a) resell any of the above goods which have been shipped and which BUYER has wrongfully failed or refused to accept, and recover from BUYER difference between the above contract price thereof and the price obtained on resale, if latter be less than former; also any incidental loss and expense, including salesman's time and expense in connection with such resale, and all demurrage (resale anywhere in the usual course of SELLER'S business or at any terminal market or at or near destination shall be proper and conclusive in the absence of bad faith), . . .
TRADE CUSTOMS: A final, complete, and exclusive statement of the entire contract is contained herein, and no parol evidence, course of dealing or performance, or usage of the trade shall be relevant to supplement or explain it. There shall be no modification or alteration without written consent signed by both SELLER and BUYER. . . .
CONFLICT OF LAWS: This contract shall be governed by and construed under the Laws of the State of Illinois.

4. Letter of credit No. 9090 recited the quality specifications as to moisture, ash and protein content and required that the 28,618 metric tons would be fit for human consumption.

5. The treaty relied upon by Bolivia was not produced or offered into evidence, however, the evidence reflected in the record, especially the testimony of Mr. Oscar Claure, supports such a finding.

## THE FLOUR CARRIER

13. St. John, as representative of Bolivia, made several unsuccessful attempts into the liner/conference market to locate a carrier to transport the flour. Consequently, St. John surveyed the tramp steamer market to seek out interested parties. The only tramper to respond to the inquiries of St. John was T. J. Stevenson & Company.

14. Subsequently, on April 27, 1974, Stevenson and St. John entered into a contract of carriage, commonly referred to as a booking note, whereby Stevenson was to transport 28,618 metric tons of flour from Mobile, Alabama, to Bolivia, via Arica/Antofagasta, Chile, ports of entry for Bolivia. (TJS Ex. 2) The shipping dates were 8,618 metric tons between May 15 and June 10, 1974, and 20,000 metric tons between June and October, 1974. The freight rate was $60.00 per ton. (TJS Ex. 2)

15. The booking note anticipated that the total flour cargo would be carried in a series of voyages, initially extending through September 1974. The schedule would be set by Bolivia and in accordance with the instructions from Bolivia, St. John altered the schedule periodically, including a delay of the final shipment to October 31st because of congestion in the Port of Arica. The position maintained by Stevenson throughout these proceedings is that although Bolivia advised ADM of the shipping delays and notwithstanding the fact that ADM consented to at least some of the later schedule changes, ADM was not privy to the Stevenson-Bolivia (St. John) contract.[6]

16. The second letter of credit No. 9115 was opened by Bolivia on May 7, 1974, in favor of Stevenson in an amount not to exceed U.S. $1,923,120.00. It was payable by sight draft accompanied by (1) commercial invoice and (2) clear "on board" ocean bills of lading. (TJS Ex. 4) This letter of credit was also amended on three occasions to resolve the difficulties encountered in placing vessels on berth in Mobile in accordance with the schedule set up in the booking note.

## OTHER PARTIES INVOLVED IN FLOUR TRANSPORT MIDWEST TO MOBILE

17. In order to transport the flour from the mills [7] to Mobile for export, ADM

---

**6.** The relevant provisions contained in the booking agreement read in pertinent part as follows:

1. This booking is subject to all terms and conditions of the vessel's usual bill of lading, whether issued or not, and of the current tariff of carrier, all of which are hereby made a part of this contract. This agreement is subject to safe arrival of vessel. The carrier excepts strikes, accidents, or other hindrance of any kind whatsoever preventing the carrying out of this contract. If on account of conditions either existing or anticipated such as strikes . . . ., acts or restraints of government, princes, rulers, and peoples, wars or any circumstances beyond the carrier's control, the carrier or its agents should consider it impossible, unsafe or (having regard to the ship's dispatch and further prosecution of her voyage), inadvisable to proceed to call or remain at, port of loading, the carrier shall have the option of postponing or cancelling shipment of all or any part of the cargo covered by this contract and the vessel shall not be bound to proceed to, call at or remain at, the port of loading. Vessel, unless at owner's option, is not to be detained at port beyond scheduled date of sailing.

3. Freight to be prepaid in full at rate as above on delivery of original bill of lading, unless otherwise stipulated in the contract

. . .

6. All cargo to be received and/or delivered at ship's tackle and receipt and or delivery beyond ship's tackle shall be entirely at the option of the carrier and solely at the expense of the shipper and/or consignee.

10. Carrier will not be responsible for demurrage, storage or any other charge that might accrue against shipment while awaiting delivery of the vessel.

15. The provisions of the Carriage of Goods by Sea act of the United States . . . shall govern throughout the entire time the goods are in the custody of the carrier.

**7.** The flour supplied by ADM in performance of its contracts with Bolivia came from seven (7) different mills located generally in the Midwest. Although the mills and the milling process will be discussed below, suffice it to say at this point, that the seven mills providing the Bolivian flour were:

1. O'Keene Milling Company in O'Keene, Oklahoma.

2. Shawnee Milling Company in Shawnee, Oklahoma.

engaged the services of D. F. Young Company (D. F. Young), a freight forwarder in New York. As ADM's foreign freight forwarder, D. F. Young would handle the "red tape" of exportation, namely, the export declarations and shipping documents necessary for ADM to comply with the Bolivian letters of credit.

18. T. A. Provence and Company (Provence) was a local Mobile freight forwarding company hired by D. F. Young to carry out the part of the operation in the port city of Mobile.

19. Page & Jones, Inc. (Page & Jones) operated as the steamship agent for Stevenson in Mobile throughout the flour movement. As agent, it was to coordinate the arrival of the vessels and cargo so that the flour could be loaded aboard the ships.

20. Atlantic & Gulf Stevedores (Atlantic & Gulf) was appointed to load the cargo from the warehouse at the Alabama State Docks on to the ships.

21. During April 1974, ADM requested Superintendence, Inc. (Superintendence) of New York, to sample and test-weigh the flour prior to loading on the vessels and to prepare quality certificates. (TJS Ex. 119) Bolivia was notified of Superintendence's function by letter from ADM to Dr. Loria of the Bolivian Embassy on April 29, 1974. (ADM Ex. 132) It is the position of ADM that the method of sampling, the time of sampling, and the other details of the performance by Superintendence of the sampling and inspection function were determined and carried out by Superintendence and that ADM gave no instructions to Superintendence as to how and when to perform the sampling and testing. In effect, ADM asserts that Superintendence was an independent contractor and not an agent of ADM.

## CARGO OPERATION AND PROCEDURE IN THE PORT OF MOBILE

22. After milling, the flour in question was loaded on railway cars, generally 1,000 bags per car, and dispatched. As reflected by the testimony, the mills would notify Provence, their local freight forwarder, that the cars were on their way. Upon arrival in Mobile the railroad would notify Provence, which in turn, contacted the Traffic Department of Page & Jones, which handled the cargo and documentation. The Traffic Department passed the arrival notice on to the Operations Department which was responsible for all matters pertaining to a vessel's arrival, stay and departure. Additionally, the Operations Department of Page & Jones was contacted as to the date of arrival of a particular vessel through Stevenson or via the incoming vessel's radio.

23. Thereafter, Mr. Reese Armour, head of Operations for Page & Jones, went to the Alabama State Docks, where a berth was assigned in which to work the flour cargo. Armour would also obtain a permit for the Alabama State Docks authorizing the rail cars to enter the docks. The next step in this cargo transport required the head of the Traffic Department, Mr. Al Crismon, to contact Provence to have the rail cars sent to the pier designated by the Alabama State Docks.

3. International Multifoods in Blackwell, Oklahoma.
4. International Multifoods in North Kansas City, Missouri.
5. Gooch Milling Company in Lincoln, Nebraska.
6. Western Star Milling Company in Salina, Kansas.
7. ADM mill in North Kansas City, Missouri.

Bolivia asserts that the contracts between ADM and the Ministry called for the purchase of ADM flour and the labels in which such flour was packaged stated that the flour was manufactured by ADM. Bolivia further asserts that ADM breached its contracts with the Ministry in that a large portion of the flour was in fact, manufactured and supplied by mills other than those owned or operated by ADM. Admittedly, a large quantity of flour was manufactured and supplied by non ADM mills, however, the evidence supports ADM's contention that milling companies oftentimes contract with other mills in order to adequately meet contract orders. Accordingly, the Court finds that such a practice is customary in the flour industry, and therefore, did not breach the contract.

24. Subsequently, a car list designating a lot number for each car, car number contents and the specific date that each car arrived in Mobile was documented. This information was gathered by Mr. Danny Cleveland of Provence. The car list was then furnished to Page & Jones by letter or telephone. As stated previously, the railroad received its instructions from Provence and the cars were sent to the Alabama State Docks, entered the docks, and proceeded to the warehouse for unloading.

25. The flour was unloaded at the back side of the warehouse which had access to the rail carriers, the front of the warehouses have access to the slip where the ships dock. The Alabama State Docks furnished the labor to discharge the cargo and used its own check sheets to provide receipts to the railroad attesting to the number of bags and the apparent condition of the cargo. (ADM Ex. 2 checks sheets) In addition to the checker from the Alabama State Docks, Page & Jones also had a checker to watch the unloading.

A basic issue to be determined concerns the type and extent of the inspection made by the checkers of both the Alabama State Docks and Page & Jones. Admittedly, these checkers would usually inspect the bags and note any torn or damaged bags. Moreover, the checkers looked for any shortages or wet bags. Immediately after the State Docks employees had signed the check sheets, Page & Jones checkers would sign the Alabama State Docks receipt which contained the following stamped notation:

### NON–NEGOTIABLE

The undersigned acknowledges receipt of the goods specified herein, in the apparent order and condition noted, subject to all of the terms, conditions and exceptions of the company's usual form of bill of lading and which shall be applicable at all times while the goods are in the custody of the company.

PAGE & JONES INC., AGENTS

By ----------------------- [8]

Having considered the testimony, the Court finds that no internal inspection or sampling was made at this point for the presence of infestation or foreign matter in the flour. The Court further finds that any inspection made by the checkers of the Alabama State Docks, Atlantic & Gulf and/or Page & Jones was a visual inspection looking only for apparent, observable external conditions such as wetted bags, torn and/or damaged bags and shortages.

26. Upon receipt of the cargo, the flour was unloaded from the railroad cars onto pallets and was then picked up by forklifts and placed in the warehouse at the direction of the Alabama State Docks' authorities.[9]

### SANITATION AND EXTERMINATION THE WAITING PERIOD IN WAREHOUSES 3 AND 4

27. While awaiting loading aboard the vessels SOUTHWALL, ARIZONA and NEDON, the flour was stored in Warehouses 3 and 4 which are owned, operated and maintained by the Alabama State Docks. The above numbered warehouses were selected and assigned by the State Docks authorities and said cargo was retained at all times in these warehouses until the arrival of the particular vessel on which the cargo was to be loaded.

28. According to the testimony of several witnesses, including that of Mr. Robert Hope, Director of the State Docks, Warehouses 3 and 4 are dockside structures with concrete floors, concrete and metal walls, and metal roof and framing.

A threshold issue to be determined concerns the sanitary conditions in Warehouses

---

**8.** ADM Ex. 78.

**9.** After receipt of the cargo by the State Docks, necessary recoopering would take place either by the railroad or by the State Docks personnel. Upon completion of recoopering, the cargo was signed for by representatives of Page & Jones, subject to the terms of Stevenson's usual bill of lading. The State Docks check sheets were used for this purpose and were delivered to and retained by the State Docks although other interested parties could obtain copies upon request.

3 and 4 during that several month period of 1974 where the cargo was stored and later loaded onto the vessels. The Court takes judicial notice that the summer months, including the month of September, 1974, were hot and humid in Mobile, Alabama. Moreover, the testimony of Mr. Kenton L. Harris, an experienced and well-qualified entomologist, along with the testimony of several other witnesses, demonstrates that such conditions as exist in Mobile are favorable for the development and growth of the *tribolium casteneum* (red rust flour beetle) and the *tribolium confusum* (the confused flour beetle). In addition, it is undisputed that during this period vessels arrived and docked at the State Docks from many foreign ports carrying wide varieties of cargo including food products such as grits, rice, wheat feed and flour. These cargoes are stored for varying periods of time in all of the State Docks warehouses.

In support of its claim that the conditions in Warehouses 3 and 4 were unclean and not fit to store flour cargo, ADM asserts that other cargoes were loaded onto the same pallets as the ADM cargo over varying periods of time. ADM further relies upon the testimony of Ron Dunmire, a representative of Superintendence who testified to having seen empty and loaded pallets in Warehouses 3 and 4 during September 1974, which contained residues of prior cargoes and that insects were seen in said residues. In addition, ADM points out that Mr. Michael Pyer, a London surveyor, employed by Stevenson's underwriters, reported in his inspection on October 19, 1974, some dead infestation on some of the pallets used to load the flour in question.

29. In opposition to ADM's position, Stevenson asserts that Warehouses 3 and 4, in all respects, were apparently clean and fit to receive and store flour cargo. Bolivia's position is that the Alabama State Docks maintained an extensive sanitation and extermination program and therefore the warehouses were clean.[10]

30. Mr. Tom Richards testified that the State Docks maintained a sanitation program and that he supervised a sanitation crew of some thirty-three (33) men and three (3) road-type mechanical sweepers. Moreover, he testified that the crew cleaned each warehouse at least once per week with Richards maintaining a daily check. Generally, a cleanup consists of sweeping the floors, walls, ledges and pallets. The warehouses were swept after a cargo was moved out. Finally, Richards testified that this sanitary procedure was followed regularly during 1974.

31. The supervisor in charge of rodent and pest control was Mr. Harold Nelson, a full-time pest control expert licensed by the State of Alabama. Nelson testified that part of his job, with the help of several assistants, was to periodically spray each pallet with a 3-grade 57% solution of MALATHION.[11] According to Nelson, pallets were brought out of the warehouse, dropped (turned over with lift trucks) to knock off foreign matter and/or dislodge residue and sprayed with a high pressure fire hose. Nelson further stated that he, with the help of assistants, would spray each pallet with malathion using 300 pounds of pressure and a two foot fan nozzle. Nelson also testified that the pallets were never used without having been sprayed, and that the pallets used to hold the ADM flour were sprayed before and after their use.[12] According to Nelson, the warehouses were checked and sprayed ev-

10. Bol. Proposed Finding of Fact at 7–8.

11. Malathion, which was used for spraying by the Alabama State Docks, was recognized by a number of witnesses, including several flour mill managers, as being an effective and recommended procedure for the destruction of insects that are an inherent vice to flour.

12. The Director of the Alabama State Docks testified that the State Docks owns between 25,000 and 30,000 pallets. ADM relies on certain portions of the Director's testimony wherein he questioned the actual practice of being able to effectively clean and spray each and every pallet before it was put back into use. The Court, however, finds that there is insufficient evidence to conclude that the pallets used to store the ADM flour were not properly cleaned or sprayed.

ery 3 or 4 months. At times the warehouses were sprayed when they were empty or almost without cargoes. Testimony revealed that the floors, cracks and ledges and walls up to 2–3 feet were sprayed. Moreover, Warehouses 3 and 4 were sprayed in July and November 1974. In addition, the evidence discloses that the flour which made up the first lifting of the ADM shipment was stored in the Alabama State Docks Warehouses 3 and 4 as of May 6, 1974. The flour for the next four liftings was likewise stored in said warehouses and despite the fact that some of these liftings laid on pallets during the hottest part of the summer, no live infestation was found until September 24, 1974. This fact, together with others, leads the Court to believe that the infestation was brought to the warehouses instead of originating in the warehouses. Accordingly, the Court is of the opinion that there is insufficient evidence to support the contention that live infestation existed in Warehouses 3 and 4 prior to the arrival of the ADM flour.[13] On the contrary, the Court finds that the infestation of the flour in question did not come from the Alabama State Docks' Warehouses 3 and 4.

## PRODDING AND A PROBING

32. Subsequent to the arrival of the flour at the Alabama State Docks, and before the flour was loaded aboard the vessels, representatives of Superintendence began test weighing the flour and taking random samples of the flour with an instrument known as a grain probe.

33. Although ADM appointed Superintendence to inspect and weigh the flour cargo, Superintendence received no instructions from ADM or Provence as to how or when the sampling was to be performed. However, samples were taken as close as possible to the estimated time of arrival (ETA) of the vessel.

34. The method of sampling consisted of a two percent (2%) random sample, that is 20 bags per 1,000 were sampled with a trier or grain probe. Such a sample from 2% of the bags contained only 10 oz. of the 100 pound bag sampled. In effect, the sample contained less than 1% in volume of the 2% sample of each lot. Thus, as asserted by Stevenson, the inspector actually viewed less than 1 part in each 5,000. The sample was taken by inserting the probe into the middle of the bag and thrusting it forward towards the opposite end until it was filled. The probe was then withdrawn and the sample was placed into a paper bag. Thereafter, the sample was taken to Superintendence's office on the State Docks. In the office the flour was screened through a 50-mesh screen. Any residue on the screen was examined for infestation and was noted by the sampler. Subsequently, the sample was forwarded to Superintendence's New Orleans office along with a report which in turn was sent to the Superintendence's laboratory in New York for chemical analysis. There, analyses were run on the flour to determine the moisture, ash and protein content. Following this chemical analysis the results of the laboratory test along with the report and findings of the Superintendence representatives in Mobile were incorporated into a Certificate of Quality.

35. At this juncture, an issue that has pervaded this entire action, concerns the effectiveness of the 2% random sample probe and whether the sample of each lot forwarded to the laboratory in New York City for chemical analysis was in fact a representative sample of the Bolivian flour.

Bolivia maintains that since the sample sent to New York had already been sifted and, therefore, contained no foreign matter, the sample was "cleaned up" and was not in fact representative of the flour in the warehouse. (TJS Ex. 27, 28) Accordingly, it is Bolivia's theory that the results of the anal-

---

13. One expert witness, an entomologist for the United States Department of Agriculture, who regularly checked cargoes in the warehouses, testified that there were no reports or findings of any infestation during this period in 1974.

This testimony was corroborated by both Mr. Litton and Mr. Zortman, field officers for the United States Department of Agriculture in the Port of Mobile.

ysis were misleading and therefore, the certificates of quality were fraudulent.

36. A synopsis of the misrepresentation theory advanced by Bolivia alleges that when the samples of the car lots of flour that were to be loaded aboard the SOUTH-WALL and ARIZONA were taken by Mr. Dunmire's part-time workers and later sifted by Dunmire, the live insects that were found on his sieve were not placed back into the sample that was forwarded to the Bureau of Chemistry Laboratory Division of Superintendence in New York for analysis. In other words, the analysis was not representative of the flour sample in Mobile in that the insect fragments, insect larvae, among other foreign matter, were sifted out of the samples before they were sent off to the laboratory.

Admittedly, the live insects found in Mobile were not placed back into the sample forwarded to the New York laboratory. However, the testimony of several witnesses, including that of Mr. Harris, is that a chemical analysis is an analysis on the chemical constituents of the particular food product; namely, an analysis to determine the moisture, protein and ash count and not the infestation or insect fragment count. Moreover, the foreign matter detected on Dunmire's sieve was noted in his report and this information was cited by Dunmire. The Certificates of Quality presented to Bolivia on the flour cargo for the SOUTH-WALL and ARIZONA do not describe the extent or amount of infestation,[14] yet there is insufficient evidence to show that Superintendence or ADM attempted to camouflage their findings. Moreover, no evidence was offered that Superintendence prepared their certificates differently for Bolivia than for other customers requesting such an analysis.

Having considered the testimony, the Court is of the opinion that there was no misrepresentation as to the Certificate of Quality presented to the Embassy in Bolivia.

Regarding the effectiveness of the 2% composite sampling, the question presented is whether this method employed by Superintendence was a reliable and acceptable method of sampling to determine infestation or the absence thereof. Having heard the expert testimony, the evidence establishes that there are more effective methods of sampling flour to determine infestation. Michael Pyer testified that his inspection of flour cargo consisted of examining the mouths of the bags, and after slitting the side of the bag, he would rake his hand across to locate insects which are generally located near the surface. The Court finds that the random 2% grain probe method is not the most reliable and effective test to determine infestation or its absence. However, this method is acceptable in the trade.

THE SIXTH AND SEVENTH LIFTINGS AND THE INSPECTION TIMETABLE FOR THE ARIZONA AND SOUTHWALL

37. As previously stated, the flour purchased by Bolivia was to consist of eight liftings. The first five liftings were completed by September 1, 1974. Of these five liftings, the ARIZONA had carried one lifting to Chile and the SOUTHWALL had carried two liftings. With the exception of a ruptured waste water line on the SOUTHWALL causing the wetting of some bags and some external infestation on only 12 bags of flour (ADM Ex. 89), and caustic soda contamination aboard the INCA YAHUAR HUACA, a Peruvian liner service vessel, the first five liftings went without major problems, notwithstanding the normal torn, wet and short bags of flour which usually occur on ocean voyages.

The issues to be determined herein concern the Sixth, Seventh and Eighth liftings.

---

14. The language contained in both reports, excluding that of the report number, is identical and reads as follows:

Representative samples were drawn by selecting 2 percent of the bags at random. *Upon examination, some live infestation was noted. Upon completion of loading, entire cargo was fumigated in holds of vessels to eliminate live infestation.* A portion of this sample submitted to our Bureau of Chemistry, Laboratory Division of Superintendence Company New York for analysis which resulted as per this report No. N–11311. (Re: SOUTHWALL) Report No. N–11314 (Re: ARIZONA). (Emphasis Added) (TJS Ex. 27, 28)

Of equal importance, are the chronologic dates surrounding these liftings.

38. Superintendence was responsible to sample the cargo destined for the SOUTHWALL and ARIZONA prior to loading. Each car lot was to be sampled and weighed. Superintendence would then use the mark "S&W" signifying that the cargo had in fact been sampled and weighed. Unless Superintendence notified Provence to the contrary, the flour was loaded aboard the vessel and shipped.

39. The ARIZONA loaded September 20–27, 1974, (TJS Ex. 34) and the SOUTHWALL loaded September 23–25, 1974. (TJS Ex. 35) [15]

40. Samples of cargo destined for the ARIZONA and SOUTHWALL were taken by Mr. Walter Smith, a part-time employee of Superintendence, on or before Friday, September 20, 1974, and marked with the usual "S and W's". Due to an absence of several days from his office, Dunmire, the only Superintendence employee permitted to screen the flour for infestation did not begin his screening until September 24, 1974. The ARIZONA commenced loading on September 20, 1974, at 0800 hours. The SOUTHWALL commenced loading cargo on September 23, 1974, at 0800 hours. Both dates were known to Superintendence.

41. There is no evidence indicating that the loading stevedore and/or ship personnel observed any apparent infestation while loading. The Court finds the first discovery of infestation was made by Dunmire during the late afternoon of September 24, 1974. At that time Superintendence advised the loading stevedore that some 36½ lots (37 or 38) had been found to have signs of infestation and a "hold" was placed on the cargo. (TJS Ex. 104)

42. Before determining the source and extent of infestation that was discovered prior to loading aboard the ARIZONA and SOUTHWALL, it is significant to note the dates that these vessels were presented by Stevenson as well as to consider what effect, if any, did Bolivia's request for a shipping delay have in the sequence of events.

### THE ARIZONA

43. This Liberian motor vessel was scheduled to berth in Mobile, Alabama, in late August 1974. (ADM Ex. 11, 85) Actually, the vessel arrived September 4, 1974 and entered Bender Dry Dock where she stayed until September 19, 1974. (ADM Ex. 74) Stevenson asserts that the ARIZONA encountered a "hurricane on one occasion" which necessitated repairs and caused her late presentment for loading in Mobile.[16]

44. ADM asserts that the shipments that went aboard the ARIZONA began arriving in Mobile as early as August 12, 1974, and that by August 23, 1974, there were 94 carloads of flour in Mobile which were sufficient to load the ARIZONA. (ADM Ex. 101) ADM further asserts that between September 4 and September 20, 1974, Superintendence representatives test weighed and sampled the cargoes bound for the ARIZONA.

### THE SOUTHWALL

45. This Panamanian motor vessel arrived in Mobile, Alabama on September 22, 1974, and the following day began loading the flour cargo. (TJS Ex. 35)

46. The sampling of the cargoes to go aboard the SOUTHWALL, like the ARIZONA, began on September 4, and was completed on September 26, 1974.

### THE CONGESTION IN THE PORT OF ARICA

47. On September 12, 1974, sub-secretary Landivar telexed the Bolivian Embas-

15. The NEDON loaded October 15–17, 1974, (TJS Ex. 3) however, due to the separate claims made by the parties, and for clarity of discussion, the chain of events surrounding the NEDON cargo will be noted below.

16. The evidence establishes that the port log of the ARIZONA contains no information whatsoever indicating that the vessel sustained damage which resulted from a "hurricane" at sea or that the vessel encountered hurricane damage on her way to Mobile. On the contrary, the record discloses that when the vessel was drydocked at Bender Ship Repair yard, Hurricane Carmen hit the Gulf Coast and the Port City of Mobile when the ARIZONA was already drydocked, thus delaying her presentment.

sy in Washington requesting a thirty day shipping delay in order to "decongest the Port of Arica." (Bol. Ex. 39)

48. Dr. Loria inquired of Mr. Noel McHugh, Vice President of St. John as to the possibility of obtaining a delay in the shipment of the ·flour. Subsequently, McHugh contacted Stevenson who agreed to the delay and arranged for a later presentment for the ARIZONA, SOUTHWALL and NEDON. After obtaining Stevenson's consent, McHugh telephoned Gordon Stoa, Vice President of Exports at ADM and asked if ADM would arrange for a shipping delay. Stoa agreed to the delay and through Mr. Cleveland, the manager of Provence, who was able to have the "free time" at the Alabama State Docks extended so that no wharfage charges would be incurred.

49. The Bolivian request to have the shipping delayed was arranged by September 20, 1974. However, by this time there were in the warehouses in Mobile, 158 cars of flour, enough to load the ARIZONA, SOUTHWALL and parts of the NEDON. (ADM Ex. 101) Moreover, other cars were already enroute.

50. Infestation [17] was discovered by Dunmire on September 24, 1974, wherein he found live internal infestation in 36½ car lots. Upon reviewing the loading list Dunmire noted that 19 of these cars had already been loaded aboard the ARIZONA and SOUTHWALL. Thereafter, Dunmire made a visual inspection of the exterior of the bags remaining in the warehouse. Although Dunmire was aware that 17½ car lots were internally infested upon his visual check he found external infestation. Dunmire further testified that he was unable to make a visual check for external infestation of all the bags aboard the ARIZONA and SOUTHWALL but testified that it was possible that all of the bags were externally infested.

51. According to the testimony, Dunmire notified Provence and Mr. Kenny Patrick, Chief Clerk for Atlantic & Gulf, of the infestation. Dunmire, with a purple felt tipped pen, marked on Patrick's loading lists (TJS Exs. 105, 106) the cars which were infested. Upon hearing from Dunmire, Patrick stopped loading operations until further notice. The evidence shows that the following car lots, which had already been loaded aboard the ARIZONA were internally infested: [18]

| CAR LOT NUMBER | WAREHOUSE ARRIVAL DATE | MILL |
|---|---|---|
| 424 | 8/23/74 | IMKC |
| 435 | 8/19/74 | IMKC |
| 437 | 8/13/74 | IMBL |
| 438 | 8/13/74 | IMBL |
| 463 | 8/16/74 | ADM |
| 479 | 8/23/74 | ADM |
| 486 | 8/16/74 | SM |
| 487 | 8/10/74 | SM |
| 493 | 8/16/74 | WS |
| 507 | 8/22/74 | IMKC |
| 510 | 8/23/74 | IMKC |
| 517 | 8/21/74 | IMBL |
| 522 | 8/19/74 | SM |
| 537 (part car) | 8/26/74 | ADM |
| TOTAL = 13½ lots | | |

52. As to the SOUTHWALL, the evidence discloses and the Court so finds, that the following infested car lots were loaded aboard the SOUTHWALL: (See ADM Ex. 92)

Gooch Milling Company, Lincoln, Nebraska—G
International Multifoods, North Kansas City, Mo.—IMKC
International Multifoods, Blackwell, Okla.— IMBL
O'Keene Milling Company, O'Keene, Okla.— OK
Shawnee Milling Company, Shawnee, Okla. —SM
Western Star Milling Company, Salina, Kansas—WS

[17]. For purposes of this discussion, infestation will be referred to as the presence of insects living in and feeding on a foodstuff. In the ordinary sense of the word, "to infest" means "to trouble greatly by numbers or by frequency of presence." Webster's Third New International Dictionary 13 (unabridged ed. 1961).

[18]. As a matter of convenience, the following abbreviations will be substituted in place of the particular mill during the course of this opinion's computations:

ADM Milling Company, North Kansas, Missouri—ADM

| CAR LOT NUMBER | WAREHOUSE ARRIVAL DATE | MILL |
|---|---|---|
| 433 | 8/13/74 | IMKC |
| 434 | 8/19/74 | IMKC |
| 455 | 8/21/74 | WS |
| 468 | 8/21/74 | IMKC |
| 482 | 8/14/74 | ADM |
| 512 (part car) | 8/21/74 | IMBL |
| TOTAL = 5½ lots | | |

53. The Court further finds that the car lots listed below were in the warehouse destined to be loaded on the ARIZONA and SOUTHWALL; however, these lots were found infested and therefore, were "held back" and not loaded aboard the vessels. Held back from the SOUTHWALL were:

| CAR LOT NUMBER | WAREHOUSE ARRIVAL DATE | MILL |
|---|---|---|
| 428 | 8/13/74 | IMBL |
| 452 | 8/13/74 | OK |
| 464 | 8/21/74 | IMKC |
| 485 | 8/14/74 | SM |
| 512 (part car) | 8/21/74 | IMBL |
| TOTAL = 4½ lots | | |

Held back from the ARIZONA were:

| CAR LOT NUMBER | WAREHOUSE ARRIVAL DATE | MILL |
|---|---|---|
| 423 | 8/14/74 | IMKC |
| 450 | 8/12/74 | OK |
| 451 | 8/13/74 | OK |
| 456 | 8/13/74 | ADM |
| 472 | 8/16/74 | IMBL |
| 473 | 8/16/74 | IMBL |
| 476 | 8/13/74 | ADM |
| 488 | 8/16/74 | SM |
| 491 | 8/28/74 | SM |
| 500 | 8/20/74 | IMBL |
| 501 | 8/20/74 | IMBL |
| 521 | 8/19/74 | SM |
| 527 | 8/22/74 | ADM |
| TOTAL = 13 lots | | |

54. Of the above-numbered car lots found to be internally infested by Dunmire on September 24, 1974, car lots 428, 437, 438, 450, 456, 476, 566, 569, 571 and 573 were previously inspected by Walter Smith, a Superintendence inspector. Bolivia maintains that lots 437 and 438 were loaded aboard the ARIZONA infested whereas, ADM contends that lots 437 and 438 were previously tested by Smith and found free

19. See pre-trial order dated August 1, 1975, filed jointly by Stevenson and ADM. Sub-section VIII lists the witnesses that ADM "will or

of infestation. On more than one occasion during the course of this trial, the Court specifically stated to counsel for ADM that Walter Smith should testify. However, Smith never appeared at the trial and no explanation was offered to explain his absence.[19]

55. Car lots 428, 450, 451, 456 and 476 were held back from the ARIZONA and SOUTHWALL and after fumigation were loaded on the NEDON. As will be noted below, Lots 566, 569, 571 and 573 were originally designated for the NEDON and after fumigation were loaded aboard the vessel.

## WAREHOUSE FUMIGATION AND FUMIGATION ABOARD THE SOUTHWALL AND ARIZONA

56. Sequentially, upon the discovery of infestation, Dunmire notified Mr. Cleveland of Provence, in turn, Cleveland called ADM and informed them of the infestation. Mr. Stoa advised Cleveland to make arrangements to fumigate the car lots in the warehouse. ADM asserts that although ADM agreed to fumigate the lots in the warehouse, ADM did this to "maintain good customer relations, although he felt no obligation to do it."

57. Immediately thereafter, Mr. Crismon of Page & Jones received a call from Cleveland informing him of the infestation. Crismon notified Armour of Page & Jones. Armour learned that some of the cargo that had been loaded aboard the ARIZONA and SOUTHWALL was infested. Armour notified Stevenson in New York and then spoke with Cleveland again about what action should be taken since they were to post the labor gang in order to have longshoremen on the job site the next day if the flour was to be off loaded.

58. On behalf of Stevenson, Page & Jones sent the following telex to Provence:
PAGE JONES MOB
9/24/75 * * * * SEPT 24, 1974

may call". Mr. Walter Smith appeared on the witness list submitted by ADM.

ON BEHALF OF OUR PRINCIPALS, OWNERS AND/OR OPERATORS OF THE M/S SOUTHWALL AND M/S ARIZONA, WE HAVE TO ADVISE YOU THAT YOUR PRINCIPALS, THE SUPPLIERS AND/OR SHIPPERS OF CARGOES OF BAGGED FLOUR BEING LOADED ONTO SAID VESSELS, WILL BE HELD LIABLE FOR ANY AND ALL LOSSES, DELAYS OR DAMAGES, BROUGHT ABOUT BY THEM AND/OR THEIR AGENTS HAVING RELEASED SAME FOR LOADING ON BOARD VESSELS POSSIBLY INFESTED WITH WEEVILS OR OTHERWISE NOT IN ORDER TO LOAD. WE MUST ADVISE THAT BOTH YOU AND YOUR PRINCIPALS WERE WELL AWARE THAT BOTH VESSELS ARE IN PORT AND HAVE BEEN LOADING FOR THE PAST SEVERAL DAYS AND NO ADVERSE CONDITIONS WERE REPORTED UNTIL LATE THIS P.M. PAGE & JONES, INC.

AGENTS M/S SOUTHWALL & M/S ARIZONA

(TJS Ex. 103)

59. On September 25, 1974, St. John telexed the following to Gordon Stoa of ADM:

RE: WEEVILS INFESTATION IN BAGGED FLOUR VESSELS "SOUTHWALL" AND "ARIZONA"

PER OUR TELEPHONE CONVERSATION THIS MORNING WE HAVE RECEIVED THE FOLLOWING TWX FROM STEVENSON, THE OPERATORS OF BOTH REFERENCED VESSELS. QUOTE: WEEVILS HAVE BEEN FOUND IN THE FLOUR LOADED ON BOTH M/S ARIZONA AND M/S SOUTHWALL. THIS NECESSITATES FUMIGATING BOTH VESSELS WHICH IS FOR SUPPLIERS ACCT. ALSO ANY VESSEL TIME LOST ACCT. FUMIGATING IS FOR SUPPLI-

ERS ACCT. INCLUDING LODGING AND FEEDING OF THE CREW IF THEY MUST BE REMOVED FROM THE VESSEL DURING THE FUMIGATING.

(Bol. Ex. 24)

In addition the St. John telex to Stoa also included the telex cited above sent by Page & Jones to Provence. St. John as agents for the Embassy of Bolivia requested that ADM advise St. John as soon as possible regarding arrangements being made to fumigate the vessels. (Bol. Ex. 24)

60. In Stevenson's counter-claim against ADM, Stevenson claims, among other things, that on September 25, 1974, ADM agreed to pay for the cost of fumigation of the SOUTHWALL and ARIZONA. It was the testimony of Mr. Thomas J. Stevenson, President of Stevenson Lines, that the agreement to have ADM fumigate the vessels was made through Noel McHugh of St. John. Mr. Stevenson further testified that this agreement occurred during a tripartite telephone conversation between McHugh, Stevenson and Stoa. At the trial, Stoa testified that no agreement to fumigate the SOUTHWALL and ARIZONA had been made by ADM. McHugh testified that while he recalled having been involved with a telephone conversation with both Stevenson and Stoa on September 25, 1974, no agreement was made on that date and at the time of the telephone conversation he was not negotiating any agreement.

Moreover, Cleveland of Provence, and Armour of Page & Jones, testified that ADM did not agree to fumigate the vessels.

61. The evidence shows that Armour of Page & Jones spoke with Mr. Hurd, the exterminator from A & P Termite and Pest Control Co., (A & P Termite) and the fumigation of the vessels was arranged and did take place upon completion of the loading of the SOUTHWALL and the ARIZONA.[20]

---

20. It is significant to note that at the trial Hurd testified that he had never fumigated flour before and that in fumigating this flour cargo aboard the SOUTHWALL and ARIZONA he did not use a fumigating manual or other printed information. Hurd further testified that he simply followed the directions on the can, as far as the temperature and amount of gas were concerned, however, he stated that he could not recall the amount of gas used. No tests were made after the fumigation to see if the gas had penetrated to all of the bags down in

It is further uncontradicted that Armour had been directed by Mr. Ivan Ellis, Vice President of Operations for Stevenson, to fumigate the vessels and that Hurd was paid by Page & Jones as agents for Stevenson. (ADM Exs. 45, 46)

62. Although Cleveland of Provence contacted Hurd of A & P Termite to come to the docks to discuss the fumigation of the 17½ car lots in the warehouse, there is no evidence to support the finding that Cleveland ordered and/or directed Hurd to fumigate the flour on board the SOUTHWALL and ARIZONA. Clearly, the evidence shows that Armour as directed by Ellis contacted Hurd and made the necessary arrangements to fumigate the vessels.[21] In support of its position that ADM never agreed to fumigate the SOUTHWALL and ARIZONA, ADM relies on a telex from Stevenson to ADM dated September 27, 1974, wherein Stevenson telexed the following:

WE WISH TO ADVISE YOU THAT WE WILL NOT SAIL M/S SOUTHWALL OR M/S ARIZONA FROM MOBILE WITH THE FLOUR CARGOES LOADED FROM YOUR SUPPLY UNTIL YOU AGREE TO PAY THE FUMIGATION AND ATTENDANT CHARGES RE CREW ACCOMMODATION AND FEEDING PLUS SHORE POWER AND WATCHMEN WHICH EXPENSES WERE OUTLINED TO YOU YESTERDAY. IN ADDITION WE WILL EXPECT TO BE PAID DETENTION CHARGES IN THE AMOUNT OF $3,000 PER DIEM OR PRORATA FOR PART THEREOF FOR THE SOUTHWALL AND $5,000 PER DIEM OR PRORATA FOR PART THEREOF FOR THE ARIZONA FROM THE TIME OF COMPLETION OF LOADING UNTIL VSLS SAIL WITH OUR DEMANDS SATISFIED WITH A LETTER OF INDEMNITY CONCERNING INFESTATION

AND A PROMISE TO PAY THE EXPENSES REFERRED TO ABOVE WITHIN 10 DAYS OF PRESENTATION, SUCH BILLS TO BE VERIFIED AS TO TIME INVOLVED BY YOUR AGENT. LETTER OF INDEMNITY REQUIRED IS FURNISHED BELOW.

IN ACCORDANCE WITH OUR NUMEROUS TELEPHONE CONVERSATIONS AND TELEXES OF SEPTEMBER 24 and SEPTEMBER 25 AND IN CONSIDERATION OF THE ISSUANCE OF CLEAN BILLS OF LADINGS AND/OR DOCK RECEIPTS WE THE UNDERSIGNED ADM AGREE TO PAY ALL EXPENSES INCURRED IN FUMIGATING THE CARGO OF BAGGED FLOUR PRESENTLY ON BOARD THE M/V SOUTHWALL AND M/V ARIZONA AND ANY OTHER EXPENSES REASONABLY INCURRED AS A RESULT OF SAID INFESTATION AND TO HOLD HARMLESS WESTERN PACIFIC SHIPPING CORP., ORAM S. A. OF PANAMA, T. J. STEVENSON AND CO., INC. TIMECHARTERED OWNER OF M/V ARIZONA, THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LTD., THE M/V ARIZONA AND M/V SOUTHWALL, HER OWNERS AND UNDERWRITERS AT INTEREST FROM ANY AND ALL LIABILITY FOR INSECT INFESTATION OF THE BAGGED FLOUR LOADED ABOARD THE M/V ARIZONA AND M/V SOUTHWALL CONSIGNED TO THE ORDER FOR ACCOUNT OF MINISTERIO DE INDUSTRIA Y COMMERCIO LA PAZ, BOLIVIA, AND FROM ANY AND ALL DAMAGES TO SUCH CARGO RESULTING FROM SUCH FUMIGATION OF FLOUR.
WE WOULD FURTHER ADVISE YOU THAT THE M/S ARIZONA IS COMMITTED TO A CONTRACT IN EQUADOR BASED UPON A NORMAL DU-

the holds of the vessels. Finally, Hurd testified that in order to fumigate the vessels he hired additional helpers from Atlas Exterminators.

21. Ivan Ellis' deposition testimony reflects that he spoke with Mr. Stoa of ADM on September

25, 1974, and that Stoa would not agree to any settlement of claims. (See TJS Ex. 66, Notes of Ellis requesting inspection of cargoes of NEDON, ARIZONA and SOUTHWALL)

RATION EXPECTATION FOR THE CURRENT VOYAGE AND WE WILL IN ADDITION HOLD YOU LIABLE FOR ANY DAMAGES WE INCUR DUE TO YOUR INACTION IN THE ABOVE MATTER WHICH MAY CAUSE THE CONTRACT REFERRED TO ABOVE TO BE CANCELLED.

> T. J. STEVENSON AND CO., INC. AS AGENTS FOR WESTERN PACIFIC SHIPPING CORP. AND ORAM S.A.

(TJS Ex. 44)

63. ADM further relies on a telex dated September 28, 1974, sent by Stevenson through Page & Jones to ADM which reads:

M/V ARIZONA AND M/V SOUTHWALL

> SINCE WE HAVE BEEN UNSUCCESSFUL IN REACHING AGREEMENT ON OUR REQUEST FOR A LETTER OF INDEMNITY AND COMPENSATION FOR COSTS AS OUTLINED IN NUMEROUS CONVERSATIONS AND TELEXES, WE ARE OBLIGED TO CARRY OUT COUNSELS ADVICE AND DISCHARGE THE CARGO IN BOTH VESSELS. DISCHARGING WILL COMMENCE MONDAY, SEPTEMBER 30TH AND ALL COSTS INVOLVED WILL BE FOR ADM ACCOUNT.

(TJS Ex. 45)

Immediately upon receipt of the September 28th telex from Page & Jones, ADM telexed Mr. Ellis of Stevenson and informed them that ADM rejects any and all claims with respect to insect infestation aboard the SOUTHWALL and ARIZONA.[22] From the foregoing the Court finds that there is insufficient evidence to substantiate the Stevenson claim that an agreement existed between Mr. Stevenson and ADM to pay for the costs and expenses related to the fumigation of the SOUTHWALL and ARIZONA.

### AN ASSURANCE

64. Originally, Stevenson's second claim against ADM for the costs and expenses associated with fumigation of the SOUTHWALL and ARIZONA was that ADM assured Stevenson that the cargoes on the vessels "would be acceptable" to Bolivia following fumigation and that in reliance on this assurance, Stevenson arranged for the fumigation of the vessels at a total cost of $24,277.57 which Stevenson paid and that ADM declined to reimburse Stevenson for the cost of this fumigation. (TJS Ex. 42)[23] Subsequently, Stevenson submitted an amendment to its counterclaim against ADM. Stevenson moved the court to allow it to amend Paragraph VIII of its counterclaim by striking the words "would be acceptable" therefrom and substituting thereof "met the standards of ADM's contract with" Bolivia. In opposition to this amendment ADM asserted that the amendment came entirely too late with no excuse for the delay and its allowance would result in a great injustice and prejudice to ADM.[24]

65. On February 17, 1976, the trial in this cause began. On February 26, 1976,

---

**22.** The September 30, 1974, telex from ADM to Mr. Ellis reads in its entirety:

> RE YOUR TELEX SEPTEMBER 27, 1974, WITH RESPECT TO THE M/S SOUTHWALL AND M/S ARIZONA. ADM MILLING CO. HEREBY REJECTS ANY AND ALL CLAIMS WITH RESPECT TO INSECT INFESTATION ABOARD SAID VESSELS. ADM MILLING CO. SOLD FLOUR FAS, MOBILE, ALABAMA TO MINISTERIO DE INDUSTRIA Y COMERCIA LA PAZ, BOLIVIA, AND DELIVERED GOOD CARGO IN ACCORDANCE WITH SALES TERMS. DEMAND IS HEREBY MADE THAT CLEAN DOCK RECEIPTS OR ON BOARD BILL OF LADINGS BE DELIVERED IMMEDIATELY TO ADM. FAILURE TO DELIVER SUCH

> DOCUMENTS SHALL MAKE YOU LIABLE FOR ALL COSTS AND EXPENSES INCLUDING INTEREST AND ATTORNEYS FEES WITH RESPECT TO THE CARGO AND WE SHALL TAKE SUCH ACTION AS THE LAW AFFORDS AGAINST YOU, THE VESSEL OWNERS AND THE VESSEL TO PROTECT OUR RIGHTS.
> (TJS Ex. 45)

**23.** Stevenson also made claim against Bolivia for the costs and expenses incurred for the fumigation of the vessels. (ADM Exs. 45, 46) Bolivia declined to pay these expenses.

**24.** See Supplemental brief of ADM filed August 9, 1976, at 2.

Stevenson rested, subject only to Stevenson's right to offer additional testimony as to damages. At that time ADM filed and argued a motion for judgment pursuant to Rule 41 of the Federal Rules of Civil Procedure. Said motion was taken under submission by the Court.[25] However, on March 4, 1976, Stevenson moved the Court for leave to amend its complaint. In support of its motion to amend, Stevenson asserts that the amendment serves the purpose of correcting an earlier misunderstanding of counsel and that it reflects actual facts as developed by discovery.[26] This motion to amend was taken under submission by the Court for an extended period in order to ascertain the effect of said amendment. Admittedly, the motion to amend came at the eleventh hour of this cause. Nevertheless, the Court was of the opinion that such an amendment would come as no surprise to ADM. Moreover, in the instant case, the litigation has been complicated and the Court has liberally allowed all parties to amend. Therefore, on August 10, 1976, the Court granted Stevenson's motion to amend its counterclaim against ADM.

66. The only evidence offered in support of Stevenson's claim was the testimony of Mr. Stevenson. In his testimony, Mr. Stevenson specifically stated that Mr. Stoa of ADM had assured him on a number of occasions that the flour met contract specifications. However, Mr. Stevenson did not testify that Stoa told him that the flour, after fumigation, met contract specifications. Moreover, the position continually advanced by Mr. Stoa was that ADM always had delivered good clean flour to Mobile. ADM further asserted throughout the trial that once the flour was inside the warehouse, ADM had completed its delivery. Based on all the evidence, the Court finds that Stoa did not tell, or convey the impression to Stevenson that the flour, after fumigation, met contract specifications. Furthermore, assuming that the assurances as alleged by Stevenson were to the effect that the cargoes, after fumigation met contract specifications, the evidence demonstrates that the condition of the cargoes allegedly assured by ADM as meeting its contractual commitment was different from the condition of the cargoes aboard the SOUTHWALL and ARIZONA upon arrival in Arica. In sum, the bags of flour that contained infestation by live weevils which prompted Bolivia to initially refuse to take the cargo would most assuredly not meet contract specifications. Therefore the Court is of the opinion that even construing the alleged assurance or assurances in the strongest possible light for Stevenson, it could not amount to an assurance that the flour containing live weevil infestation (Bol. Ex. 1) would meet contract specifications. The Court finds that Stevenson has failed

25. ADM's motion for Judgment pursuant to Rule 41(b) F.R.C.P. was denied by the Court on August 4, 1976.

26. Stevenson's theory is that the amendment says in substance the same information that was taken in the second deposition of Mr. Thomas J. Stevenson, Jr. on May 11, 1975, wherein Mr. Stevenson responded to several questions propounded by the ADM counsel. The statement along with the colloquy in which it appears is as follows:

Q. Mr. Stevenson, did anyone acting on behalf of ADM ever tell you to go on and take that cargo to Bolivia?
A. To take the cargo to Bolivia?
Q. Yes, and that it would be acceptable?
A. I don't think they were concerned whether we took it or not. At the end they were concerned that they got a clean bill of lading. And, why, I don't know, because they previously . . .

Q. Did anyone ever tell you from ADM that the cargo would be acceptable to the Bolivians?
A. Yes, sir.
Q. Who?
A. Stoa, he said this is acceptable under my contract.
Q. He said it was acceptable under my contract?
A. That's right. He said his contract only stipulated that it was fit for human consumption. And, that as far as they were concerned this was fit for human consumption.
Q. Did he ever tell you that the Bolivians would accept it when it arrived at Arica?
A. *I don't think he put it in those words, he said this was acceptable flour under their contract.* (emphasis supplied)
Dep. of Thomas J. Stevenson at 64 and 65. See Stevenson Supplemental Brief filed July 20, 1976, at 10–11.

to sustain its burden of proving the assurance and reliance claimed in its counterclaim against ADM.[27]

## IT NEVER RAINS IN ARICA AND THE ROUNDABOUT DISCHARGE

67.  Following the fumigation of the ARIZONA and SOUTHWALL, and having been issued clean bills of lading by Stevenson (TJS Exs. 38, 39) both vessels sailed from Mobile on September 30, 1974, and arrived in Arica on Saturday, October 12, 1974. (ADM Exs. 73, 74)

68.  On Monday, October 14, 1974, at 8:30 a. m., the discharging of the two vessels began.   The ARIZONA unloaded about 1,000 bags into Warehouse No. 3 and the SOUTHWALL unloaded approximately 800 bags in an open concrete area.  In an effort to blunt ADM's attack concerning the storing of flour cargo in an open area, Bolivia asserts that since Arica has a desert-like climate the cargo is not affected by rain. Admittedly, while rain may be absent from the Arican geography, wind is not.   The testimony of Mr. Eduardo Mino discloses that when the flour cargoes were ultimately discharged from the SOUTHWALL and ARIZONA, it was necessary to cover the cargoes to avoid contamination caused by the wind, such as the spreading of dust, and from the dejections of sea birds that flew above the exposed bags of flour. (ADM Ex. 155)

69.  As the cargo from both vessels was being discharged infestation was detected. Mr. Oscar Claure, head of the Bolivian Customs Agency in Arica, AADAA, testified that he received a telephone call at his office concerning the cargo infestation. Claure further testified that he proceeded to the Port of Arica where he examined the cargoes that had been unloaded from the vessels.  Upon examining the bags of flour, Claure found live and dead weevils.

70.  Shortly thereafter, Claure and Marcello Quiroga, Bolivian Chief of Operations of AADAA, boarded the ARIZONA and SOUTHWALL to check for infestation. Upon examination of the vessels, Claure testified that he immediately consulted Landivar by telephone and advised him of the infestation of live weevils on the SOUTHWALL and ARIZONA.  Landivar ordered Claure to reject the ARIZONA–SOUTHWALL cargoes.   The telex from Landivar to Claure on October 15, 1974, states:

.   .   .   CONFIRMING MY INSTRUCTIONS OF YESTERDAY ABOUT ARRIVAL LOTS 1645 SOUTHWALL 4056 ARIZONA SINCE BOTH LOTS ARE INFESTED THEY MUST BE REJECTED THROUGH SAME VESSELS STOP—WE ARE TRANSMITTING CONTEXT TO SHIPPING COMPANY STEVENSON LINES STOP—GENERAL MANAGER HOME ASSURANCE IS GOING THERE TO COMBINE THIS OPERATION.
(Bol. Ex. 40)

It is stipulated that at the time that Bolivia had stopped the discharging of the ARIZONA–SOUTHWALL cargoes, Bolivia had already paid the purchase price and the freight.

## STEVENSON'S COUNTERCLAIM AGAINST BOLIVIA FOR DEMURRAGE, DELAYS AND LOST PROFITS ON THE ARIZONA AND SOUTHWALL

71.  Stevenson seeks to recover against Bolivia for frustrating the discharge of the ARIZONA–SOUTHWALL cargoes, resulting in their unnecessary detention in South America.  Stevenson maintains that Bolivia's refusal to discharge was arbitrary and unreasonable which resulted in the delays of the ARIZONA and SOUTHWALL for a period of twenty-three (23) days in that the

---

**27.**  Even assuming that an assurance as is alleged in Stevenson's counterclaim was in fact made, the evidence presented was without dispute that no written assurance and/or guarantee was ever made by ADM.  As will be demonstrated below, Stevenson's claim that ADM verbally assured them that the flour would be acceptable to Bolivia is barred by Title 20, § 6, Code of Alabama (Recomp.1958)

vessels were forced to anchor off the port with the cargoes of flour still in the holds.

72. Stevenson further maintains that on prior voyages portions of the flour cargoes had been damaged and on each occasion, the damaged cargo was discharged promptly by Bolivia and then damage claims were resolved. Stevenson contends that the discharging of cargo whether damaged or not is the normal commercial method of handling cargo loss and therefore, it is unreasonable to inactivate the carrying vessels resulting in the vessels being forcibly idled.

73. In opposition to Stevenson's claim, Bolivia argues that when Claure rejected the infested cargo the Chilean port authorities "simultaneously" order the ARIZONA and SOUTHWALL out of the port of Arica since they were fearful that other cargoes would become infested as a result of the infestation on both vessels.

The factual background surrounding the Stevenson counterclaim is essential to a determination of the issues involved herein. On Friday, March 19, 1976, sub-secretary Landivar was on the witness stand and he testified for the first time that it was his decision to reject the ARIZONA–SOUTHWALL cargoes and to refuse to discharge the vessels. It was at this time that he took from his pocket, Bol. Ex. 40, heretofore discussed in Finding 70 above. (See Finding 77 noted below) Upon hearing this testimony for the first time that the refusal to discharge the cargoes originated from Bolivia, counsel for Stevenson gave notice to Bolivia of its intended amendment by making the following statement in open court: [28]

> In view of the documents produced by Landivar—and still not being clear as to the total import and without withdrawing any of our previous claims against other parties—and while Landivar and Loria are here—we put the Bolivians on notice of our intention to file an alternative counterclaim against Bolivia for expenses of the detention of the ARIZONA and SOUTHWALL because of the refusal of Bolivia to permit discharge of the AR-

IZONA and SOUTHWALL in the routine manner and to make routine claims for damages without unnecessarily tying up the ships.

74. On Friday, March 19, 1976, the trial recessed until April 5, 1976, however, due to scheduling conflicts of counsel and the Court, trial was not reconvened until April 19, 1976.

75. On April 2, 1976, during the trial recess, Stevenson filed its amended answer and counterclaim against Bolivia. On April 14, 1976, Bolivia filed a motion to strike the amended answer and counterclaim of Stevenson, arguing that: Stevenson failed to obtain permission of the Court before amending its answer and filing its counterclaim; that the filing of said counterclaim was not in compliance with the provisions of Rule 13 (F.R.C.P.); that it was untimely and was not filed until five weeks of trial of this action. In addition Bolivia asserted that she would be unduly prejudiced and suffer irreparable harm in that Bolivia had already completed the testimony of eight of its nine factual witnesses, three of which had returned to Bolivia, one had returned to Chile, and one witness had returned to Miami, Florida. In short, Bolivia was not in a position to defend the Stevenson counterclaim.

76. On April 16, 1976, Stevenson finally filed its motion for leave to amend, relying on its oral request made on Friday, March 19, 1976, in open court. The above-styled matters were taken under advisement by the Court.

## COAT POCKET DISCOVERY AND THE PRODUCTION DILEMMA

77. Aware of the prejudicial nature of allowing such a counterclaim, the Court reserved its ruling until after hearing post-trial arguments on the proposed findings of fact and conclusions of law. Subsequently, on August 4, 1976, the Court granted Stevenson's motion to amend along with its amended answer and counterclaim. Conversely, the Court denied Bolivia's motion

---

28. Motion for Leave to Amend, filed by Stevenson, April 16, 1976.

to strike the amended answer and counter-claim.

This entire cause has been filled with requests for production and motions for production by counsel for all parties. Moreover, the tools of discovery have been burdened with language translations and geographic distance. Although counsel for all parties diligently attempted to meet production requests as set by the Court's timetable this was not always possible. Another added ingredient that delayed discovery was the appearance by Bolivia in this lawsuit after Stevenson and ADM had conducted extensive discovery for approximately ten months.[29]

Interestingly enough, documents were produced during the course of the trial. It is significant to note that Landivar, the former Bolivian sub-secretary, produced documents from his coat pocket during his testimony supporting his decision to reject the ARIZONA–SOUTHWALL cargoes.

78. Having set out the background giving rise to the Stevenson counterclaim against Bolivia, the issue squarely before the Court is whether Bolivia wrongfully refused to discharge the cargoes, and is therefor liable for demurrage, detention and lost profits.

Upon reviewing the evidence the Court finds there is insufficient evidence to support Bolivia's contention that as Claure rejected the infested cargo, the Chilean port authorities "simultaneously" ordered the vessels out of the Port of Arica. The evidence shows that Landivar ordered Claure to refuse the shipment of flour aboard the SOUTHWALL and ARIZONA on October 14, 1974, and then Landivar confirmed his order by telex to Claure the following day. (Bol. Ex. 40)

Ultramar, Stevenson's agent in Arica, attempted to notify Stevenson by phone on October 14, 1974, and later sent two telexes to Stevenson on October 15, 1974, informing Stevenson of the Ministry's oral and written instructions to AADAA not to receive the ARIZONA–SOUTHWALL cargoes. (TJS Exs. 26, 71)

79. The argument raised by Bolivia that the Chilean authorities ordered the vessels away from the docks is not supported by the evidence and the Court so finds. Assuming however, that the Chilean authorities ordered the vessels out of the Port of Arica, this finding would be immaterial since Landivar ordered the stoppage of the flour cargoes and the evidence shows that only Landivar was in a position to say when the discharging could be resumed.[30] Accordingly, the Court finds that the refusal of Bolivia to permit its own prepaid cargo to be discharged was an arbitrary and unreasonable decision by Bolivia, and therefore, Bolivia is liable to Stevenson for the value of the ARIZONA and SOUTHWALL'S time and necessary expenses resulting therefrom.

29. See Civil Docket, Civil Action 74–501–T, pp. 1–8. The original complaint by T. J. Stevenson & Company against 81,193 Bags of Wheat Flour was filed on November 21, 1974. Bolivia entered this cause as a third-party defendant on September 26, 1975.

30. The SOUTHWALL and ARIZONA remained at anchor in Arica Bay from October 14, 1974 to November 5, 1974. During this stalemate the evidence discloses that Mr. Stevenson went to La Paz, Bolivia, in an effort to negotiate an agreement between Stevenson and Bolivia. Present during these series of negotiations were, among others, Sub-secretary Landivar of the Ministry, Luis Saenz Pancheco of American Home Insurance Company, Bolivia's insurer, Noel McHugh of St. John, Gonzalo Pinell of Securit International, Steamship Mutual, Stevenson's underwriter and Mr. Stevenson. ADM was not involved in these meetings.

Subsequently on October 28, 1974, an accord was reached between the Ministry and Stevenson whereby, in order to minimize the losses resulting from the ARIZONA–SOUTHWALL cargoes, the Ministry agreed to accept the cargo, have it unloaded and turn it over to Securit International, a salvage firm which was to dispose of the flour in a manner consistent with minimizing the losses. (TJS Ex. 55)

Although this agreement was signed by Landivar on behalf of the Ministry, and Mr. Stevenson as well as several other individuals on October 28, 1974, the ARIZONA and SOUTHWALL did not tie up in the Port of Arica and begin discharging until November 5, 1974. It is significant to note that no member or official of the Chilean government signed this agreement.

## THE EIGHTH LIFTING AND THE VESSEL NEDON

80. The vessel NEDON [31] began loading flour cargo on October 15, 1974, and completed loading on October 17, 1974. (TJS Ex. 3) However, prior to the vessel being loaded, Superintendence had found more car lots which were infested and subsequently had them fumigated by A & P Termite under the direction of Hurd.

81. On September 20, 1974, when ADM advised the Ministry that the shipping delay it requested would be acceptable, there were already 33 car lots of flour at the Port of Mobile designated to be loaded aboard the NEDON and additional cars were en route from the mills. The balance of the flour arrived in Mobile between the dates of October 2, and October 14, 1974, although one car lot did arrive on October 17, 1974. (ADM Ex. 101) These car lots were tested and sampled by Superintendence between October 12 and October 17, 1974.

82. It should be noted that some 17½ lots that were originally intended to be loaded aboard the SOUTHWALL and ARIZONA were "held back" [32] and retained in the warehouse as of September 24, 1974, when Dunmire first found infestation. The 17½ lots were placed in he warehouse. Superintendence did not have the entire cargo in the warehouse fumigated, instead the known infested lots were pulled some several feet from the other cargo and fumigated.

83. The actual fumigation of the warehouse lots did not occur for several days after discovery. During this period an additional 12 or 13 [33] lots were found to be infested while in the warehouses. These additional lots were also fumigated.

84. Subsequently, the 17½ car lots were fumigated and loaded aboard the NEDON. A question is presented as to whether 12 or 13 additional car lots were loaded onto the NEDON with one of the car lots not having been fumigated. The evidence discloses that the fumigation of the additional car lots were carried out pursuant to Dunmire's filed report.[34] The field report listed only 12 cars as infested. Therefore, one externally infested car lot, Number 598, was loaded aboard the NEDON without having been fumigated and this Court so finds.

85. In an effort to prevent the loading of infested cargo, as had occurred with some twenty lots aboard the ARIZONA and SOUTHWALL, Page & Jones requested that Provence furnish it with written releases signifying that the cargo was "ok for loading". The Court finds that all cargo

---

**31.** On October 4, 1974, Stevenson entered into a time charter with Nedon Navigation Company for the M/V NEDON. The vessel went on charter on October 13, 1974, as the NEDON passed the Florida Keys enroute to Mobile.

**32.** See Finding 53, supra.

**33.** The additional cars found to have internal and external infestation were:

| LOT NO. | DATE ARRIVED IN WAREHOUSE | MILL |
|---------|---------------------------|------|
| 448 | 8/12/74 | OK |
| 508 | 8/23/74 | IMKC |
| 566 | 9/13/74 | ADM |
| 569 | 9/12/74 | ADM |
| 571 | 9/13/74 | ADM |
| 573 | 9/16/74 | ADM |
| 580 | 9/24/74 | WS |
| 581 | 9/17/74 | WS |
| 599 | 9/24/74 | WS |
| 603 | 9/24/74 | WS |
| 607 | 9/25/74 | G |
| 624 | 10/10/74 | ADM |

Car lots 448 and 508 were sampled by Superintendence between September 20 and September 27, 1974, and found to be free of infestation. When sampled in October, internal infestation was found. Moreover, the remaining lots were found to be externally infested. Of these car lots numbers 556, 569, 571, 573, and 581 had been inspected by Superintendence between September 20 and September 27, 1974, and had been found clean.

All additional cars were fumigated in the warehouse between October 5 and October 16, 1974, and resampled and found free of any live infestation. (ADM Ex. 102)

**34.** Dunmire's filed notes (TJS Ex. 122) under the heading "Lot Numbers" contains notations which show that thirteen and not twelve lots were infested. The evidence shows that car lot No. 598 was inadvertently omitted when Dunmire transcribed his field notes to his field report. (Compare TJS Ex. 122 with ADM Ex. 9)

loaded onto the NEDON was cleared in writing by Superintendence including the additional carload lots found to be infested and later fumigated.

86. Following these inspections and clearances, the cargo, consisting of 81,193 bags, was then loaded on the NEDON on October 15, 16, 17, 1974. (TJS Ex. 3)

## CIRCUMSTANCES SURROUNDING THE NEDON CLAIMS: REASONED JUDGMENT

87. ADM's position is that Stevenson failed to use "reasoned judgment" in loading the NEDON cargo. The evidence discloses that the vessel commenced loading in the Port of Mobile on October 15, 1974, at approximately 8:00 a. m. It is undisputed that Stevenson knew that 17½ lots of flour to be loaded on the NEDON had previously been "held back" from the SOUTHWALL and ARIZONA and fumigated in the warehouse by ADM due to the infestation that was found on September 24, 1974.

88. The record reflects that due to the previous infestation on the loading of the ARIZONA–SOUTHWALL cargoes, Stevenson had demanded and received from Superintendence written releases attesting that the NEDON flour had been cleared for loading. (TJS Ex. 7)

89. The record further reflects that Stevenson on October 15, 1974, had notification in the form of a telex from its representative in Arica advising of the discovery of infestation of the ARIZONA–SOUTHWALL cargoes and the refusal by Bolivia to receive this cargo. (TJS Ex. 71) The telex also advised that the vessels were directed to unberth from the docks and anchor outside the Port of Arica. This information was conveyed by Mr. James Dowling, Claims Manager for Stevenson, to Mr. Bradshaw of LaMorte Burns, Steamship Mutual's American correspondent. In addition, on October 15, 1974, the evidence discloses that Mr. Ellis, Stevenson's Vice President of Operations had noted that the

Stevenson underwriters had been advised of the NEDON situation and that Ellis was waiting to hear from them concerning instruction as to who should inspect the flour. (TJS Ex. 66)

In sum, ADM maintains that with this information available to Stevenson on October 15, 1974, Stevenson should not have loaded the cargo. The Court is unable to agree with this argument as the evidence does not support a finding that Stevenson acted unreasonably or had sufficient knowledge on this date.

90. ADM contends that even if Stevenson did not have sufficient information on October 15, 1974, then in the exercise of reasoned judgment, Stevenson should have stopped loading on October 16, 1974. The evidence shows that prior to loading on October 16, 1974, the NEDON was approximately one-third loaded. (ADM Ex. 77) As loading commenced on October 16th, Stevenson requested its agents to take samples of the cargo. Pursuant to Stevenson's directions, samples from 12 lots in the warehouse were taken and hand-carried to the Shilstone Testing Laboratory (Shilstone) in New Orleans, Louisiana, for analysis. The vessel continued loading and at the end of the working day the NEDON was approximately two-thirds loaded. The Court is of the opinion that at the time the vessel was approximately two-thirds loaded Stevenson still did not have sufficient information to stop the loading of the NEDON.

However, the evidence discloses that additional information was received by Stevenson in the late afternoon or early evening of October 16, 1974, from Shilstone indicating that there was no live weevil infestation, but remains were noted. Moreover, at approximately 5:45 p. m. Mr. Ellis contacted Page & Jones in Mobile and advised them to "hold" the NEDON until further notice. (ADM Ex. 90 Vol. 2) The evidence shows that Stevenson received further information of several of the samples later that evening finding dead infestation.

Having reviewed the evidence, the Court is of the opinion that at this juncture Stevenson was no longer relying on Superintendence's written releases. More importantly, Stevenson was concerned enough about the possible threat of infestation that it had samples taken on October 16, 1974. In addition, the record shows that Stevenson was awaiting the full Shilstone report which was to be released on October 17th. (TJS Ex. 16) Finally, the determination had already been made on the evening of October 16th to halt the sailing of the NEDON, and Stevenson was awaiting the arrival of a London surveyor hired by Stevenson's underwriters to inspect the cargo.

Notwithstanding these indicators, Stevenson permitted the loading of the remaining one-third of the cargo the following day. The Court finds that Stevenson, an experienced ship operator, had sufficient warnings on the evening of October 16, 1974, to temporarily defer the loading of the remaining cargo until the full Shilstone report was received and until the surveyor had conducted his inspection. Accordingly, the Court finds that Stevenson acted unreasonably in loading cargo on October 17th and therefore is not entitled to freight for one-third of the NEDON cargo.

91. ADM maintains that Stevenson wrongfully refused to sail the NEDON. In reply, Stevenson asserts that as a result of the Shilstone report, knowledge it had received that part of the NEDON cargo had already been fumigated coupled with Stevenson's experience with the ARIZONA–SOUTHWALL cargoes and the South American developments relating thereto, Stevenson made the decision to defer the sailing of the NEDON pending a determination of whether its cargo was actually infested. Having considered the testimony, the Court finds insufficient evidence to support a finding that Stevenson's actions in not sailing the NEDON were improper.

## THE CLAUSING OF THE NEDON BILL OF LADING

92. On the morning of October 17, 1974, Perfect Lambert & Company of London, surveyors, received a request from Steamship Mutual, the P & I Club insuring Stevenson, to send a sureyor to Mobile to inspect the NEDON cargo. Mr. Michael Pyer (Pyer) was sent to make the inspection. During this period, Stevenson personnel had also been discussing the possible clausing of the bill of lading with its Steamship Mutual's representatives. (ADM Ex. 88)

On October 19, 1974, Pyer went aboard the NEDON and inspected the vessel. According to Pyer's testimony he spent approximately thirty minutes in each hold examining bags to a depth of three to four bags in various parts of each hold.[35] Pyer's inspection revealed, among other things, the presence of live and dead red rust flour beetles (Tribolium Casteneum) (TJS Ex. 14) in each of the four flour holds.[36] Pyer testified that he instructed the master of the NEDON to clause the bill of lading due to the infestation, and recommended that the vessel be fumigated. (TJS Ex. 14) The evidence is uncontradicted, and the Court so

---

**35.** Contrary to the grain probe used by Superintendence, Pyer testified that he examined random bags inside and outside and that for the internal examination he cut the bags along their belly and gradually raked the flour so as to uncover any infestation. Pyer further testified that once he found a live bug in any one bag, he ceased his examination of that particular bag as that finding was sufficient to establish live, internal infestation.

**36.** Pyer's report reads in pertinent part as follows:

". . . on the 19th October, 1974, I attended on board the vessel "NEDON" at the Port of Mobile, Alabama, in order to inspect her cargo of wheat flour.

I inspected the cargo in all four hatches as far as it was accessible and found it to be infested. Both live and dead infestation was found on the cargo in all hatches and additionally, larvae was (sic) noted.

The main specie of infestation noted was Tribolium Casteneum (red rust flour beetle) . . . .."
(TJS Ex. 14)

finds, that Stevenson made no attempt to fumigate the NEDON cargo.

93. Specimens of Pyer's findings were taken and forwarded to Rentokil Laboratory in London, England. There the Rentokil technical liaison department identified the specimens found in the NEDON holds as follows:

NEDON 1. *Tribolium Casteneum*, red rust flour beetle

NEDON 2. Larvae of *Tribolium*

NEDON 3. Many *Tribolium Casteneum.* Also some empty fly pupal cases (probably family calliphoridae, the green or blue bottle flies). One silverfish, *hepisma saccharina*, one spider.

NEDON 4. *Tribolium Casteneum* Sitophilus oyzae *(rice weevil);* *Hepisma saccharina* ; larva of an *anthrenus*

(TJS Ex. 67)

94. On October 19, 1974, Pyer also examined the Alabama State Docks warehouses 3 and 4 and found that the warehouses "appeared comparatively clean although we did find some dead infestation on pallets which had been used to load the cargo under review." [37] Pyer testified that he examined other flour cargo in the warehouse during his forty-five minute general inspection, and found no signs of external infestation.

95. From the Port of Mobile, Pyer proceeded to Arica where he inspected the ARIZONA–SOUTHWALL cargoes using the same inspection techniques used aboard the NEDON.[38]

96. Shortly thereafter, having concluded his inspection in Arica, Pyer arrived in La Paz, Bolivia, on October 25, 1974, and informed Stevenson that the cargo loaded on the NEDON was infested as well as the

cargoes aboard the SOUTHWALL and ARIZONA. Stevenson reported this information to Bolivia's representatives. Bolivia later informed Stevenson that the Ministry would not accept the NEDON cargo.

Subsequently, when the determination had been made that the NEDON cargo was infested, Stevenson tendered dock receipts and a bill of lading claused to show that the cargo was infested prior to its loading aboard the NEDON. (TJS Ex. 11) The NEDON freight was never paid. The language of the clause on the bill of lading stated:

"CARGO INFESTED BY INSECTS PRIOR TO LOADING."

ADM argues that only 29½ of the 81 lots loaded aboard the NEDON ever showed any signs of insects and therefore Stevenson should not have claused the entire cargo. Having considered the evidence, and under the circumstances surrounding the infested flour, the Court is of the opinion that Stevenson acted reasonably in clausing the NEDON and that the clausing of the bill of lading accurately reflected the existing situation as to the condition of the cargo.[39]

97. ADM advances the argument that since Stevenson was to be paid its freight of $60.00 per metric ton for the amount of the flour actually placed aboard the NEDON, Stevenson loaded the cargo to perfect its lien for freight. The Court is of the opinion, that except as to the loading which occurred on October 17, 1974, Stevenson is entitled to its freight for two-thirds of the cargo.

## THE REJECTION OF THE NEDON CARGO

98. ADM asserts that Bolivia wrongfully rejected the NEDON cargo. The evi-

---

**37.** TJS Ex. 14. (Survey Report of Michael Pyer at 3.)

**38.** Pyer testified that he found dead infestation in all holds of the ARIZONA and live external infestation in hold No. 2. Pyer further testified that on the SOUTHWALL he saw dead infestation in all four holds and live internal infestation in holds No. 2 and 3. (TJS Ex. 67)

It was Pyer's opinion that the fumigation in Mobile was only partially successful and the bills of lading on the ARIZONA and SOUTHWALL should have been claused.

**39.** There is conflicting testimony as to the exact date that the bill of lading was claused, however, the evidence discloses, and the Court so finds, that the clausing occurred between October 20 and October 31, 1974.

dence reflects that on October 24, 1974, a telex (TJS Ex. 15) was sent to First City National Bank (First City) in New York City, wherein Bolivia instructed this bank which was handling the financing for ADM and Bolivia, not to pay for the cargo due to the fact that the merchandise was found contaminated from origin as indicated by the certificate from Superintendence. (TJS Ex. 15) First City was also instructed that no payment was to be made without prior approval despite ADM's irrevocable letter of credit. (TJS Ex. 15)

99. On or about October 25, 1974, Pyer arrived in La Paz and informed Stevenson that the cargo loaded on the NEDON was infested as well as the ARIZONA–SOUTHWALL cargoes. More importantly, the evidence discloses that Stevenson, who was in the process of negotiating with sub-secretary Landivar as to whether the ARIZONA–SOUTHWALL cargoes would be taken by Securit, informed the Ministry about the infestation aboard the NEDON. The testimony is not clear as to whether Bolivia told Stevenson at that time that the NEDON cargo was not acceptable or whether Bolivia questioned Stevenson as to the condition of the cargo. However, the testimony reflects, and this Court so finds, that the Ministry told Stevenson that infested cargo aboard the NEDON would not be discharged in South America.

100. On October 26, 1974, Landivar sent the following telex to the Bolivian Embassy in Washington:

THROUGH INFORMATION PROVIDED BY THE SHIPOWNERS WE KNOW THAT FLOUR ABOARD NEDON IS COMPLETELY INFESTED. WE WILL APPRECIATE IF YOU CAN ADVISE SUPPLIERS THAT WE ARE NOT GOING TO ACCEPT SUCH CARGO, AND GIVE INSTRUCTIONS TO SHIPOWNERS NOT TO RELEASE BILL OF LADING FOR ANY REASON STOP FURTHER WE SUGGEST TO INSTRUCT THE BOLIVIAN CONSULATES IN U.S.A. NOT TO APPROVE ANY DOCUMENT IN CONNECTION WITH THIS SHIPMENT.
(Bol. Ex. 20)

ADM unsuccessfully attempted to obtain payment for the cargo and on October 31, 1974, Stoa called on Dr. Loria at the Bolivian Embassy in Washington and advised him that ADM was unable to obtain legalization of its documents so as to collect on its letter of credit for the NEDON cargo. It is asserted by Bolivia that at the meeting between Dr. Loria and Stoa, Loria advised Stoa of the contents of Landivar's telex of October 26th, and, on behalf of the Ministry rejected the NEDON cargo. The Court finds that the Ministry rejected the NEDON cargo on October 31, 1974.

101. While Stevenson was in La Paz, he was informed by the Ministry that the flour aboard the NEDON would not be acceptable if it was infested. Subsequently, Stevenson had the bill of lading claused. Stevenson informed ADM of the Ministry's rejection of the cargo. However, ADM denied any interest in the NEDON flour.

102. On November 11, 1974, Dr. Loria on behalf of the Ministry contacted Mr. Robert A. Zortman (Zortman) who was in charge of the Mobile Office of the United States Department of Agriculture Grain Inspection Division (USDA) and requested him to examine the flour aboard the NEDON. Loria specifically requested that the USDA inspect for insects, quality, whether the flour met the terms of the contract and whether or not the flour was fit for human consumption. Zortman sent Marlin Sanford (Sanford) to perform the cargo inspection. Sanford testified that his inspection lasted four hours and that samples were taken from each hold to a level of 5 bags taking 25 to 30 samples per hold with a trier. Shortly thereafter the samples were packed and sent to the Agriculture Marketing Service,[40] an agency of the United States De-

---

**40.** Approximately twenty-five years ago, the USDA adopted the guidelines of the United States Federal Food and Drug Administration. The Beltsville laboratory conducts laboratory tests on such composites to determine whether they meet the guidelines of the Federal Food, Drug and Cosmetic Act. The test performed is commonly referred to as a "filth test".

partment of Agriculture located in Beltsville, Maryland, for laboratory analysis.

103. The results of the Beltsville lab report found that the composite sample taken from Hold No. 1 of the NEDON showed 31 insect fragments, 1 whole larva and 5 analcerci larvae. The laboratory results found that Hold No. 1 of the NEDON failed to meet the Federal Food, Drug and Cosmetic guidelines for the presence of filth. Composite samples taken from Holds 2, 3, and 4, while containing some signs of infestation did not exceed the Federal Food, Drug and Cosmetic Act guidelines. (ADM Exs. 42, 133)

104. An issue is raised as to whether Beltsville Laboratory personnel made or could have made a determination as to whether Hold No. 1 of the NEDON was or was not fit for human consumption. Clearly the deposition testimony of Ms. Edith Christensen, the Director of the Beltsville Laboratory, as well as Zortman's testimony is that the "fit for human consumption" determination is made by the field officer and not the Beltsville Laboratory and the Court so finds.

In the instant case, the lab report was communicated by telephone from Christensen to Zortman on November 22, 1974. Zortman testified that he received a confirmation report (Bol. Ex. 36) on November 26th. Zortman further testified that based on the Christensen lab report as well as the live and dead infestation found by Sanford "all over the bags" in Hold No. 1 of the NEDON. (Bol. Ex. 35) Zortman, as field officer in the Port of Mobile, determined that the flour in Hold No. 1 of the NEDON was not fit for human consumption.[41]

105. As instructed by the Bolivian Embassy, Zortman reported all of his findings to Dr. Loria on November 22 or 23, 1974. The Court finds that there is insufficient evidence to find that Bolivia wrongfully rejected the NEDON cargo. The Court further finds that Bolivia had valid reasons to reject the NEDON flour and therefore is not liable to ADM for the purchase price of said flour or for any consequential damages sustained by ADM subsequent to October 31, 1974.

## 81,193 BAGS OF FLOUR AND THE HANDS OFF POLICY

106. The record reflects that on November 21, 1974, Stevenson filed suit against the cargo aboard the NEDON claiming its freight and demurrage charges. The cargo was seized and ordered by the Court to be sold. The NEDON remained fully loaded in Mobile until ADM appeared in court and bonded the flour just as it was about to be sold.

107. Prior to instituting its *in rem* complaint against the NEDON cargo, Stevenson had attempted to persuade Bolivia to accept the cargo. However, Bolivia maintained its position that the entire cargo had been rejected. Stevenson contacted ADM in an attempt to reach some type of agreement so as to break the deadlock which resulted in the enforced inactivity of the NEDON. During this period of discussion, the evidence shows that ADM's firm position was to disclaim any interest in the flour cargo on the theory that the title for the cargo had passed to Bolivia and ADM had completed its contractual obligations under the terms of its F.A.S. contracts with Bolivia.

108. As stated previously, after the Court had entered an Order of Sale on the NEDON cargo to take place on December 2, 1974, ADM made an appearance. Immediately thereafter, ADM filed a claim to the cargo and posted a bond for its release. In its claim ADM asserts that the NEDON was infested when she arrived in Mobile

41. The Commodity Examination Certificate as issued by Zortman for the account of the Bolivian Embassy reads in pertinent part as follows: The above identified lot was examined on the above date and found to contain heavy live and dead insect infestation. The nutritional value of the flour does meet the original contract requirement, however, it contains insect fragments to the extent that it is *not* considered fit for human consumption. Examination was limited to the top layers of bags stacked in Hold No. 1 of the ship. (Bol. Ex. 33)

resulting in the ADM flour becoming infested upon being loaded in her holds and that this condition was a clear breach of Stevenson's duty to present a vessel suitable for carrying flour and of Stevenson's obligations to properly care for the cargo. In support of its claim ADM presented several witnesses, including a Lloyds surveyor, Mr. John van Aken, who testified on the condition of the vessel.

109. ADM employed John van Aken, a Lloyds marine surveyor from Mobile, to survey the conditions of the holds of the NEDON. Upon examination of the holds on December 2 and 3, 1974, van Aken submitted his report finding that:

No. 3 HOLD—(Refrigerated Hold)

Caked and loose sugar deposits on ridges formed by the wooden shell sheathing, protruding hinge on Port side, horizontal shelf in way of starboard forward bulkhead, and in top of overhead wooden sheathing where holed. Deposits of sugar and a dark powder, possibly soya bean meal, on top of the cargo of bagged flour, in way of damages in overhead wooden sheathing. Bugs were found on the outside of one bag of flour. The bags were marked: "ADM Milling Co., Shawnee Mission, Kansas."

Samples of scale, sugar, bugs and meal collected on 3 December 1974.

No. 4 HOLD .

All steel hold, without wooden sheathing. Samples of sugar and scale collected.

No. 2 HOLD

Cargo loaded into hatch coaming, hold not accessible.

No. 1 HOLD

A dark powder, possibly soya bean meal found on top of the cargo battens throughout the hold and in scattered places on top of the bagged flour . .

(TJS Ex. 124 and see ADM Ex. 56, photographs A through R)

Van Aken testified that he found live weevils in the holds of the NEDON during his inspection. Van Aken further testified that if he were called upon to issue a certificate of cleanliness on the vessel NEDON that he could not, in good conscience, issue such a certificate.

However, on cross examination, van Aken conceded that he relied upon what the Master of the vessel told him about the previous two cargoes of the NEDON being sugar and soy bean meal,[42] and that the only infestation he found was on one of the bags of flour.

110. In opposition to ADM's contention that the NEDON was infested when she arrived in Mobile resulting in the ADM flour becoming infested, Stevenson argues that the cargo holds of the NEDON had been prepared for the flour cargo enroute to Mobile. According to the deposition testimony of Captain Konstantinos L. Bistis (TJS Ex. 111) and Chief Mate, Charalampos Perros (TJS Ex. 112) the holds were swept and washed down twice with water under pressure. Moreover, Captain M. C. Smith, a surveyor for the National Cargo Bureau, inspected the holds upon the arrival of the vessel in Mobile and issued a certificate of Readiness to load the flour cargo (TJS Ex. 8). Stevenson relies upon the testimony and report of Captain Jim Barry, a marine surveyor located in Mobile. Barry conducted the on-hire survey on October 15, 1974, and pronounced the holds of the NEDON clean in all respects. (ADM Ex. 124)

ADM's argument is that Stevenson was negligent in failing to fumigate the holds of the NEDON prior to receiving the flour aboard the vessel. Clearly, the evidence shows that the holds of the NEDON were not fumigated before the flour was loaded. And, excluding the certificate of readiness to load the cargo and the on-hire survey report of Captain Barry, Stevenson had no inspection for infestation performed. The Court, however, is of the opinion that Stevenson was not obligated to fumigate the empty holds of the NEDON prior to receiving the flour in question, unless it was aware that the holds were infested or that

42. TJS Ex. 123 reveals that on 8/17/74, the NEDON carried 2,159 net tons of ammonium sulphate from Hopewell, Virginia to Cutt co, El Salvador.

information was made available to the carrier informing it of an infested condition. Having considered the testimony, the Court finds insufficient evidence to show that any of the NEDON's four holds contained live infestation prior to the loading of this cargo, and therefore, the Court finds that the holds of the vessel were suitable to carry flour.[43] Accordingly, the Court is of the opinion that Stevenson properly prepared the holds of the NEDON and did not breach its contractual duty to ADM.

## AN INVITATION TO PURCHASE 81,193 BAGS OF FLOUR

111. On December 10, 1974, ADM filed its answer to the Stevenson *in rem* complaint and the following day telexed the Bolivian Embassy that ADM was claiming ownership of the flour aboard the NEDON and would proceed to resell the flour. (ADM Ex. 137)

112. The NEDON cargo was then fumigated by A & P Termite, under the direction of Mr. Hurd, and was completed on December 12, 1974. The cargo was off-loaded on December 14 and 15, 1974, and placed in a warehouse at the Alabama State Docks. (TJS Ex. 3)

Having taken possession of the flour the evidence shows that ADM sent notices throughout the world market seeking purchasers for the flour. (TJS Ex. 131) ADM contacted approximately five brokers and some ten countries. Although ADM received some inquiries, no firm offers were made to purchase the flour. ADM's position is that the flour had acquired a "reputation" because of the litigation, whereas Bolivia's theory is that the world market knew that the flour was infested and therefore, would not solicit offers to purchase.

113. Finally, on February 7, 1975, ADM negotiated a contract with Armstrong Cork Company (Armstrong) to sell a sample portion of the flour and ADM subsequently sold the remaining flour in seven lots. All of the flour sold to Armstrong was used in the manufacture of ceiling boards.[44]

## THE FLOUR MILLS

114. In order to meet the terms of its contracts with Bolivia, ADM contacted other mills located generally in the midwest, namely, O'Keene Milling Company in O'Keene, Oklahoma; Shawnee Milling Company in Shawnee, Oklahoma; International Multifoods Mill in North Kansas City, Missouri; and International Multifoods Mill in Blackwell, Oklahoma. The other three mills that were owned and operated by ADM during the milling of the Bolivian flour were the ADM Mill in North Kansas City, Missouri, the Gooch Milling Company in Lincoln, Nebraska, and the Western Star Milling Company Mill in Salina, Kansas.

115. The evidence reflects the finding that large portions of the flour of such contracts were filled by milling companies other than those owned and operated by ADM. (ADM Ex. 101) Moreover, the testimony is uncontradicted that each mill upon completion of the milling of the flour shipped the flour by rail car directly to Mobile.

| DATE | QUANTITY OF BAGS | PRICE RECEIVED |
|---|---|---|
| 2/7/75 | 2,000 | $6.285 (per bag) |
| 2/14/75 | 4,000 | $6.285 |
| 2/18/75 | 4,000 | $6.285 |
| 2/25/75 | 10,000 | $5.510 |
| 6/5/75 | 3,000 | $5.510 |
| 7/14/75 | 19,000 | $5.510 |
| 8/14/75 | 25,000 | $5.510 |
| 11/20/75 | 14,000 | $5.010 |

The total amount received by these sales was $454,716.41. ADM's contract with Boliva was $850,301.81. Therefore, the loss claimed by

**43.** In arriving at this finding, the Court focuses primarily with the issue of cleanliness of the holds of the NEDON and does not reach a determination as to the conditions of the vessel that are not germane to the issues involved herein. Indeed, the testimony and exhibits reveal that the vessel was in need of several repairs. See TJS Ex. 124; ADM Ex. 56 (A through R) and ADM Ex. 124.

**44.** The date of sale including quantities sold and purchase price received per bag are:

116. The threshold issue entangling the several claims in this cause, concerns the source and origin of weevil infestation that was found in the sixth, seventh, and eighth liftings of the Bolivian flour.

The principal contention asserted by Bolivia is that the flour supplied Bolivia for the sixth, seventh, and eighth liftings was not merchantable in that the flour loaded aboard the ARIZONA and SOUTHWALL on their last voyages and the NEDON contained both live and dead infestation.[45]

In defense, ADM argues the flour arrived in Mobile in a clean and uninfested condition and that it was milled and shipped to Mobile in accordance with good milling practices recognized in the industry and following all applicable provisions of the Federal Food, Drug and Cosmetic Act. To support its theory, ADM offered the testimony and deposition testimony of the mill managers of the seven mills. Each of the witnesses testified as to its mill's sanitation program and milling procedure. Basically, all of these programs included periodic inspections of equipment, breakdown and spot fumigation of equipment with various insecticides, daily sweeping and/or vacuuming of floors, walls and equipment, the checking and fumigation of storage bins; general and spot plant fumigation and the daily inspections and random sampling and analysis of the flour.[46]

117. Although Bolivia contends that the flour supplied by ADM contained both live and dead infestation, the theory relied upon by the Ministry focuses primarily on the conditions of three mills; O'Keene Mill at O'Keene, Oklahoma, Shawnee Milling Company, at Shawnee, Oklahoma, and International Multifoods at its North Kansas City Mill, in Missouri. Bolivia maintains that the greater percentage of infested rail cars came from these three mills and therefore the evidence supports a finding by this Court that live insect eggs did exist in at least some of the flour milled by these companies.

118. In an effort to blunt Bolivia's attacks on the milling operations, especially as related to the O'Keene Mill, Shawnee Mill and the North Kansas City Mill of the International Multifood, ADM devoted a great deal of its testimony to milling operations and procedures. Consequently, the Court will set forth its findings as to the conditions of the above-named mills.

## THE O'KEENE MILL

119. The evidence reflects that ten cars of Bolivian flour were milled by O'Keene from July 30 to August 6, 1974. Of these ten cars, three were found to be internally infested when first inspected for infestation at Mobile by Superintendence shortly prior to loading.[47] Moreover, one of the cars, car number 448, was found to be internally infested on a second inspection performed by Superintendence. Therefore, Bolivia asserts, and the Court so finds, that a total of four cars, or 40% of the cars supplied by the O'Keene Mill during this particular period were infested. (TJS Exs. 105, 106; ADM Exs. 27, 98, 99)

120. According to the deposition testimony of Carl Laubhan, Superintendent of

---

ADM on resale was $395,585.40, plus incidental expenses amounting to a total loss of $644,140.23.

45. Stevenson's position is that the cargo contained insect infestation upon its arrival in Mobile.

46. The evidence establishes that the milling process itself constitutes a cleaning process which removes impurities and foreign material from the finished product. During the milling process of flour, wheat is brought into the mill, where, after undergoing initial cleaning and soaking processes, it proceeds through a series of rollers. While passing through these rollers a portion of the endosperm, which is the center portion of the wheat kernel which becomes flour in the milling process, is broken away from the bran which is the outer coating of the wheat kernel. Thereafter, the flour passes over numerous sieves having various degrees of fineness. At the end of the milling process, the flour passes across a "rebolt sifter", which is clothed with a sieve fine enough to remove the eggs of flour weevils.

47. A total of 187 cars were originally designated for loading aboard the SOUTHWALL and ARIZONA on their last voyage from the Port of Mobile to Arica, Chile.

the O'Keene Milling Company, O'Keene was an old mill which operated twenty-four hours a day on a six day week, however, the packing department only operated on one of three daily shifts. Consequently, flour was left in storage bins for some eight hours or more during the work week and at times flour was left in storage bins over the weekend.

121. O'Keene did not have its own sanitation employee, but hired an individual from Industrial Fumigant Company of Kansas City to inspect the mill on a quarterly basis. The mill superintendent did not know the date of the nearest inspection to the milling of the Bolivian flour and no reports were furnished to the Court. The evidence shows that no dates were provided as to whether the USDA or the Pure Food and Drug Administration inspected the mill during 1974.

122. Although flour samples for insect fragment tests were taken once a month and forwarded to the parent mill at Shawnee, Oklahoma, the O'Keene Mill only employed a part-time office employee to conduct tests in its laboratory and the testimony indicates she made no tests for insect fragments. Expert testimony directs this Court to find that an insect egg cannot be seen with the naked-eye.

123. The flour in question was milled during the summer, and possible infestation in the O'Keene Mill, as in every other mill, is greater during the "hot season" and therefore, the Court finds that although fumigation is an on-going procedure of the milling industry, the mills have the most difficulty in keeping infestation to a minimum during the summer months.

124. Regarding equipment at the O'Keene Mill, Mr. Laubhan stated that cloth sifters in the mill were inspected on a monthly basis and were replaced when necessary, as they sometimes tear away from the sides leaving a slit across a section of the sieve. Finally, Laubhan testified that wire screens, like cloth sifters, are replaced when needed, however, O'Keene had no records of when such pieces of equipment were replaced during 1974.

## THE SHAWNEE MILL

125. Twenty cars of the flour milled for Bolivia were supplied by the Shawnee Oklahoma mill from August 1 to August 9, 1974, and of the twenty cars, seven, or 35%, were found to be internally infested by Superintendence, (TJS Exs. 106, 126, 127) and the Court so finds.

126. The deposition testimony of Fred Honeywell, the plant superintendent, revealed that the Shawnee Mill had a capacity of 6,100 hundred-pound bags per day. Besides the flour mill, Shawnee also had a feed mill at the same location. The flour mill operated twenty-four hours a day, five days a week, and occasionally on Saturdays. The flour storage bins are spot fumigated with Methyl Bromide monthly if they are empty, but sometimes went for two months without fumigation. The evidence discloses that the mill had a regular cleanup and fumigation program; that fogging took place every weekend. The equipment in the mill included ten to fifteen double "x" sieves in the flour stream and rebolted over wires that were the equivalent of a ten double "x".

The Methyl Bromide used to control or prevent infestation in the storage bin occurred on July 8, 1974, and would not have any residual effects left by the first week in August when the Bolivian flour was milled.

127. The mill superintendent was unable to recall the dates of any inspections conducted by any United States agencies. The closest inspection to the milling of this flour was on October 23, 1974, and this inspection was performed by Industrial Fumigant Company. Inspector Jim Arnote noted that the overall sanitation condition of the flour mill, bulk plant and flour storage warehouses was satisfactory; however, he found numerous infestations of a minor nature throughout the mill and bulk plant. The most serious infestation found by the inspection was in the flour of the pneumatic lift well on the top floor. In addition, an accumulation of miscellaneous items such as burlap bags, among other things, in cor-

ners and along walls, created a problem for sweepers if not eliminated.

Flying insects were noted in the mill and bulk plant and a recommendation was made that all windows be screened and that some screens needed repairs. Most importantly, the inspector noted that some pallets in the meal and flour warehouses were quite dirty and obviously had been in the feed mill at one time. As the mill had no system of pallet cleaning it was recommended that such a system of pallet cleaning or segregation be instituted. (ADM Ex. 125, Attached Ex. 1)

128. The Shawnee Mill had a full time sanitation employee and Honeywell testified that insect fragment counts were taken four times a week, however, no records of such insect count findings were made available to the Court.

## INTERNATIONAL MULTIFOODS MILL AT NORTH KANSAS CITY

129. International Multifoods supplied twenty cars of the Bolivian flour during the first two weeks of August 1974. Of the twenty cars supplied by this mill, seven, or 35%, of the cars were found by Superintendence to be internally infested, and the Court so finds (TJS Exs. 105, 106; ADM Exs. 98, 99)

130. The deposition testimony of Reid Sahara, plant superintendent of the North Kansas City Mill was read into the record. (ADM Ex. 127) The testimony reflects that once a month a shut-down fumigation and repair schedule was conducted, however, Sahara did not recall the date of the shut-down nearest to the milling of the Bolivian flour and no evidence of such fumigation was produced.

131. This mill employed a woman to check samples of flour as to protein, ash and moisture content, but such inspections did not test for infestation in the flour, unless of course, there were whole live insects which can be seen on such an inspection. Occasionally, samples were sent to the company's laboratory in Minneapolis, Minnesota, however, Sahara did not know whether such samples had been sent to the lab with regard to the Bolivian flour. During this period there were no USDA inspections for infestation although the testimony shows that several weeks either before or following the milling of the Bolivian flour, the government had flour being milled at the North Kansas City Mill.

132. Bolivia maintains that the percentage of carloads supplied by O'Keene, Shawnee and International Multifoods at North Kansas City that were found to be infested is significant when contrasted with the fact that of the six cars furnished by ADM's Gooch Mill prior to the sailing of the ARIZONA and SOUTHWALL on September 30, 1974, none were found to be internally infested; that out of the thirty-six cars supplied by ADM's Western Star Mill prior to the sailing of the ARIZONA and SOUTHWALL on September 30, 1974, only two, or 6%, were found to be internally infested, and of the fifty-five cars furnished by ADM's North Kansas City Mill prior to September 30, 1974, only seven, or 13%, were found to be internally infested. (TJS Exs. 105, 106; ADM Exs. 98, 99)

## THE ENTOMOLOGIST

133. In further support of its position that the flour milled at each of the seven mills arrived at the Alabama State Docks warehouses in a clean and uninfested condition, ADM relies upon the testimony of Mr. Kenton L. Harris (Harris), an expert entomologist formerly with the U.S. Food and Drug Administration (FDA).[48]

48. Counsel for Stevenson and Bolivia jointly objected to Harris testifying on any part of this cause other than on the basis of hypotheticals in that Harris was not present throughout the entire trial to hear all of the testimony. Counsel for Bolivia further objected that Harris had not heard the testimony of the fumigator and the two USDA witnesses and that in counsel's opinion this was the most important testimony with regard to the fumigation and matter of infestation. The Court ruled that Harris could be interrogated on matters while he was present in court and during his absence could only be questioned on the basis of hypothetical questions.

134. As to the adequacy and sufficiency of the sanitary procedures and milling procedures followed at the seven mills, counsel for ADM posed a series of questions to Harris based on the particular mill manager's testimony and then asked for Harris' opinion based on that testimony and his own knowledge and experience. Briefly stated, Harris replied that each of the seven mills was in good sanitary condition and that it was milling flour of good commercial, good FDA and good sanitary quality.

135. Harris further testified as to the adequacy of the rail car preparations for each of the seven mills. After hearing the mill managers' testimony and based on his own experience and knowledge, he stated that in his opinion all of the mills adequately prepared and followed the recognized standard procedures [49] of rail car preparation prior to the loading of the cargo in question. Harris conceded, however, that he did not know what happened to the railroad cars from the time they left the mills and the time they arrived in Mobile.

More importantly, Harris testified that without an inspection at the time the rail cars arrived in Mobile, there is no way one can determine whether or not the rail cars contained any infestation. There is no evidence that any inspection reports were made at the time the rail cars arrived in Mobile, and this fact weighs heavily against a finding by the Court that these rail cars arrived in the Port of Mobile without any infestation and in a clean and sanitary condition.

136. Turning to the question of whether these mills were milling good clean flour, Harris replied on cross-examination that the only way one can tell whether a mill is putting out good flour is to make a manual visual examination of these plants. Clear-

ly, the evidence reveals that Harris never made such an examination to any of these seven plants during the milling of this flour. Moreover, Harris testified that he had never visited several of the mills involved herein.

## SHUT–DOWNS AND CLEAN–OUTS

137. Having considered the unusually technical testimony, and without attempting to determine the effectiveness of each piece of machinery involved in the milling process, suffice it to say, that in spite of all precautions taken, live insects constantly make their way into mills. Admittedly, the mills from time to time fumigate mill machinery and milling rooms because of infestation or the ever present dangers of infestation. The evidence shows that infestation is inherent in flour and notwithstanding the elaborate precautions taken, the frequent repetition of tests and sifting attest to the continuing threat of infestation.

In the instant case, this Court heard testimony from several witnesses that live insects are found in the flour after milling and immediately before packing in bags.[50] It is significant that the USDA in purchasing flour from milling companies has a government inspector at the mill to take samples of flour just before it leaves the mill or at the last stage of the milling process. In addition, the USDA has an inspector to take samples at the point of destination when the rail car reaches the port of export. It is uncontradicted that these measures taken by the USDA are precautionary steps and not just "window dressing" and that these preventive measures were not taken with the flour in question.

---

49. Basically, the testimony concerning the preparation of rail cars which were to be used in the transportation of flour from the seven mills to the Port of Mobile included the initial inspection of the cars by railroad and/or mill personnel, cleaning, spraying with a fumigant, and lining the rail cars with a heavy craft paper.

50. Gooch Mill, for example, was inspected by the FDA on January 15, 1974, and the FDA inspector found two dead and one live weevil on the final rebolt sifters which are between the storage bin and the bagging machine. Although this is the final phase of the rebolt system, a tear in the # 30 mesh wire screen as was the case at the Gooch Mill, would allow these insects to be packed into the bags of flour. (ADM Ex. 120)

## THE TRIBOLIUM LIFE CYCLE

138. Throughout the trial there was considerable testimony as to the various species of weevils which infest whole wheat flour and the life stage in which they may be found. Specifically, the parties called attention to two *tribolium* species; the *tribolium confusum,* commonly referred to as the confused flour beetle, and the tribolium *castaneum,* called the red rust flour beetle.[51]

139. In the.instant case, the infestation found in the flour was primarily caused by the presence of the red rust flour beetle. According to expert testimony, the average life cycle of this beetle is six weeks. After one week the egg forms a larva which lasts for about three to four weeks. At the end of this stage the larva assumes the pupa stage and at the end of the sixth week an adult beetle emerges. Thereafter, this beetle or weevil can survive for a year and the female can lay eggs all through her life, dropping a little better than an egg a day.[52]

140. In support of its theory that the flour destined for the ARIZONA, SOUTHWALL and NEDON was infested with beetle eggs when it arrived in Mobile, Bolivia called upon USDA entomologist, John Litton, who testified about the characteristics and infestation problems associated with the red rust flour beetle. Replying to a question from counsel, Litton testified that if flour was bagged in untreated 100% cotton bags, transported to Mobile on August 26, 1974, placed in a warehouse, inspected between September 4 and September 20, 1974, and adult *tribolium castaneum* were found inside the bags, then in his opinion, the insect eggs were in the flour prior to its arrival in the warehouse in Mobile and subsequently reached the adult stage.

## SOURCE AND ORIGIN OF INFESTATION

141. As to the critical issue concerning the inception of the infestation, the position of both Bolivia and Stevenson is that the flour was infested with beetle eggs when it arrived in Mobile and that infestation began at one or more of the seven mills or in the rail cars in which the flour was shipped to Mobile. On the other hand, ADM asserts that the flour arrived in Mobile in a clean and uninfested condition and that infestation occurred after the flour went into the warehouses. ADM further asserts that the ADM flour sat in the State Docks warehouses for six weeks prior to loading and therefore the extended exposure of the warehouses and/or exposure to the conditions of Stevenson's vessels caused the infestation.[53]

Having considered the evidence presented at trial, the Court finds that widespread infestation, involving some 40 to 50,000 bags was found by Superintendence on September 24, 1974, prior to the loading of the flour aboard the ARIZONA, SOUTHWALL and NEDON and therefore, the evidence clearly establishes that these vessels were not the source of the infestation found by Superintendence on September 24, 1974.

Moreover, the evidence presented at trial supports a finding by the Court that there was no live infestation in State Docks Warehouses 3 and 4 prior to the arrival of the ADM flour. The testimony of several witnesses, including USDA inspectors Zortman and Sanford and USDA entomologist Litton, whc were frequently in the warehouses during this period, knew of no infestation. This finding is further supported by the testimony of the agents, head checkers and State Docks sanitation personnel.

51. These two *tribolium* species have similar pest characteristics but can be easily distinguished. Although there was conflicting testimony as to whether the confused flour beetle can fly, suffice it to say, that this beetle spreads primarily by crawling or by being moved with the commodity or food material in which it is living. On the other hand, the red rust flour beetle is a strong flyer, and this flying ability adds to the difficulty in preventing infestation.

52. The evidence discloses that when living in a bag of flour the beetle's instinct is to burrow toward the seams of the bag or toward the inner lining of the bag itself.

53. ADM Reply brief to Stevenson's Supplemental Brief at 2.

Additionally, it should be noted that ADM's appointee, Superintendence, was constantly weighing, probing and sampling the earlier shipments of this flour in the warehouses from April 1974 to September 1974, for internal and external infestation. In that five month period no signs of infestation were found or reported by Dunmire until September 24, 1974. If in fact, signs of infestation existed in the warehouses prior to the arrival of the flour in question it seems Dunmire would have brought this to the attention of ADM and to the Court in his testimony.

Admittedly, the flour for the sixth, seventh and eighth liftings sat in the State Docks warehouses for several weeks. This was a longer period than any of the flour cargo for the previous five liftings. However, there is no evidence to support the finding that the State Docks warehouses were infested prior to the arrival of the flour in question and therefore, the fact that these liftings stayed in the warehouses

during this extended period does not alter the Court's findings.

The preponderance of the evidence supports the finding by the Court that the source of infestation first discovered by Superintendence in Mobile on September 24, 1974, was either the rail cars or one or more of the seven mills that shipped the Bolivian flour.

## CONCLUSIONS OF LAW

1. This court has jurisdiction in this matter, in Admiralty, and of all the parties, 28 U.S.C.A. §§ 1331(1), 1333.

## STEVENSON'S IN REM ACTION AGAINST THE NEDON CARGO

2. The carrier claims a lien on the NEDON cargo for freight,[54] detention,[55] and necessary expenses totalling the sum of $450,616.33. (TJS Ex. 88)[56] In support of its claims Stevenson relies upon the terms of the booking note[57] and bill of lading.[58]

---

54. The agreed freight on the NEDON cargo to Arica, Chile, as expressed in the booking note (TJS Ex. 2) was $244,589.85.

55. The NEDON was detained in Mobile with the flour loaded aboard for 67 days, 15 hours. The evidence discloses that the daily charter hire on the NEDON was $2,850.00. Stevenson maintains that the daily profits had the vessel sailed would be $1,000.00 per day. Therefore, the total daily loss was $3,850.00. The total gross loss on account of detention would be $260,356.00, which is computed by multiplying $3,850.00 by 67 days and 15 hours.

From the gross loss of $260,356.00 the following credits are to be deducted had the vessel sailed to Arica:

| | | |
|---|---|---|
| (1) 21 days, including 3 days to load, 13 days steaming and 5 days to discharge | = | $80,850.00 |
| (2) Panama Canal Fee | = | 3,000.00 |
| (3) Fuel Expenses | = | 14,755.00 |
| (4) Necessary expenses in Chile | = | 5,000.00 |
| (5) Stevedoring costs in Chile | = | 16,000.00 |
| | | $119,605.00 |

The total deductions of $119,605.00 are to be subtracted from the gross loss of $260,356.00 resulting in the net loss of $140,751.00.

Stevenson also claims a loss of $57,575.48 resulting from the lost Big Lift Charter.

56. The itemized exhibit submitted by Stevenson omitted an additional claim of $6,114.74, for the commission on fixing the ship on charter which Stevenson alleges it must pay.

57. The booking note (contract of carriage) between St. John as representative of Bolivia and Stevenson provided that the freight would be prepaid. See note 6, supra.

58. Stevenson's ordinary bill of lading, the terms of which were incorporated into the contract (TJS Ex. 12) as well as the actual bill of lading tendered for the NEDON cargo, contain the following clauses which read in pertinent part:

This bill of lading shall take effect only as a contract with the owner or demise charterer, as the case may be, as principal, made through the agency of Stevenson Lines, T. J. Stevenson & Co., Inc., the Company designated herein, which acts as agents only and shall be under no personal liability whatsoever in respect thereof.

14. The goods, shall be liable for all expenses of mending, cooperage, bailing or reconditioning of the goods or packages and gathering of loose contents of packages; also for any payment, expense, fine, dues, duty tax, impost, loss, damage or *detention* sustained or incurred by or levied upon the Carrier or the ship in connection with the goods, however caused . . . (Emphasis added)

3. In opposition to Stevenson's claim against the NEDON cargo, ADM asserts that in order for Stevenson to collect its freight without actually having performed the voyage, there must have been in existence a valid agreement providing Stevenson with this right. Although Stevenson relies on the guaranteed freight clause provision of the Bill of Lading, ADM's position is that the evidence establishes that the vessel was owned by Nedon Navigation and was under time charter to Stevenson and therefore Stevenson signed solely as agent for the master. Consequently, by the terms of Stevenson's own document there was no contract with Stevenson, and having failed to deliver the cargo to its destination Stevenson cannot take advantage of the prepaid freight clause for the recovery of its freight.

█ It is a well settled principle of American maritime law that freight is ordinarily earned only upon delivery of the cargo to its destination. *Alcoa S. S. Co. v. United States*, 338 U.S. 421, 70 S.Ct. 190, 94 L.Ed. 225 (1949); *United States v. Waterman Steamship Corp., et al.*, 397 F.2d 577 (CA5 1968). However, parties to a contract of affreightment may alter this principle, by agreement, and may agree upon a different rule. *International Paper Co. v. The Gracie D. Chambers*, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318 (1919); *Allanwilde Transportation Corporation v. Vacuum Oil Co.*, 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312 (1910); *United States v. Waterman Steamship Corp., supra.*

█ Clearly, under the terms of the booking note and bill of lading, prepaid freight was agreed upon, and therefore the NEDON freight was earned when the cargo was loaded. The threshold issue to be determined is whether Stevenson is the proper party to institute this *in rem* action. As noted by Stevenson, this defense now asserted by ADM as to the real party in interest was never raised by ADM in its pleadings, and during discovery and the several pre-trials of this cause. Moreover, Stevenson argues that this defense is contrary to the booking note (TJS Ex. 2) letters of credit (TJS Ex. 4) and the bill of lading (TJS Ex. 12) entered into between Stevenson and the Embassy of Bolivia. The booking note does not stipulate that Stevenson is to use its own vessels, but that Stevenson will provide vessels to carry the flour cargo. Both the letter of credit and the bill of lading are between Stevenson and Bolivia. Having considered the matter, the Court is of the opinion that the bill of lading is binding on the parties and therefore, under the terms of the applicable bill of lading, as well as the documents entered into between the parties, Stevenson is the proper party in this cause. Accordingly, the Court finds that Stevenson had a lien on the cargo for freight and that the guaranteed freight clause is applicable in this action. *The Eddy*, 72 U.S. (5 Wall) 481, 18 L.Ed. 486 (1866), *Langley, Common Carriage of Cargo* at 229, *Code of Alabama*, Title 7A, Sec. 7–307.[59]

15. . . . *Full freight hereunder to port of discharge named herein shall be considered completely earned on shipment* whether the freight be stated or intended to be prepaid or to be collected at destination; and the carrier shall be entitled to all freight and charges due hereunder, whether actually paid or not and *to receive and retain them irrevocable under all circumstances whatsoever ship and/or cargo lost or not lost or the voyage broken up or abandoned.* If there shall be a forced interruption or abandonment of the voyage at the port of shipment or elsewhere any forwarding of the goods or any part thereof shall be at the risk and expense of the goods. All unpaid charges shall be paid in full and without an offset, counterclaim or deduction in the currency of the port of shipment, or, at the Carrier's option, in the currency of the port of discharge at the demand rate of New York exchange as quoted on the day of the ship's entry at the Custom House of her port of discharge. *The Carrier shall have a lien on the goods, hereunder, and may enforce this lien by public or private sale, without notice.* The shipper and the consignee shall be jointly and severally liable to the Carrier for the payment of all charges and for the performance of the obligation of each of them hereunder . . . (Emphasis added)

59. ADM also challenges Stevenson's reliance on the bill of lading on another ground. ADM asserts that in order for the guaranteed freight clause in the bill of lading to become operative,

4. In the event that the prepaid freight clause is applicable, ADM points to the Court two additional "obstacles" preventing a recovery by Stevenson on the NEDON cargo.

a. ADM asserts that the various lots of flour which comprised the NEDON cargo arrived in Mobile in a clean and uninfested condition and that the flour in question became infested in the warehouses subsequent to its delivery by ADM. Page & Jones, as representatives of Stevenson, signed for the cargo and their activities in the placement and location of the flour establishes that Stevenson had custody and control and the responsibility for the safekeeping of the cargo. Moreover, ADM asserts that Stevenson as a "user" of the Alabama State Docks is bound by its tariff which provides that the responsibility for cargoes placed in the warehouses is that of the vessel upon receipt. (ADM Ex. 40)

▮ The Court is unable to agree with ADM's argument in that the preponderance of the evidence supports the finding that the flour in question did not arrive in Mobile in a clean and uninfested condition. Furthermore, Stevenson's customary bill of lading provided that the carrier's responsibility would commence when cargo was within reach of ship's tackle. It is uncontradicted that infestation was discovered before the car was "free alongside" and "within reach of ship's tackle" as to each vessel.[60]

b. ADM maintains that Stevenson did not exercise "reasoned judgment" in loading the flour aboard the NEDON. ADM further maintains that Stevenson's sole purpose in loading the cargo was to attempt to perfect a lien on the flour cargo. ADM cites *Orient Mid-East Lines, Inc. v. Cooperative for A.R.E., Inc.,* 133 U.S.App.D.C. 307, 410 F.2d 1006 (1969) for the standard of conduct that is required of a carrier before it is entitled to take advantage of a prepaid freight clause. In affirming the standard of conduct set forth by the District Court, the Circuit Court of Appeals held that:

"[T]here is a common standard of conduct prescribed if a carrier is to be afforded the protection of the exculpatory provisions. The Court finds that standard to be that to afford itself the protection of the exculpatory clauses of the bills of lading the carrier must exercise reasoned judgment under the circumstances existing and reasonably foreseeable at the time the judgment is made. In other words the exculpatory clauses do not confer a license to disregard the likely or the obvious." 133 U.S.App.D.C. at 309, 410 F.2d at 1008.

▮ Although *Orient Mid-East Lines, supra,* is factually distinguishable from the case at bar, this Court is of the opinion that the reasonableness criteria set forth above should be applied to Stevenson.[61] In doing

the bill of lading had to be issued. Moreover, the steps and method of distribution that were followed on the first seven voyages were not followed with respect to the NEDON. There is conflicting testimony as to the exact date that the bill of lading was signed and claused. Suffice it to say, however, that the claused bill of lading was properly issued by Stevenson. (See Finding 96)

**60.** There was conflicting testimony as to the meaning of the term "free alongside" commonly referred to as F.A.S. in the Port of Mobile. ADM's position is that the State Docks tariff demonstrates that as between shipper and the State Docks, the delivery to the warehouse places the cargo at the risk of the vessel. On the contrary, Stevenson introduced the Rules and Regulations for the Port of Mobile (TJS Ex. 24) relying primarily on Rule # 8 which provided:

"The phrases "alongside" and "within reach of ship's tackle" when applied to the receipt of and delivery of cargo, shall be construed literally, and the responsibility of the vessel shall commence and cease at the end of the tackle used by the ship."

As will be noted below, the Court is of the opinion that the activities and circumstances surrounding these F.A.S. contracts along with the actions of ADM's appointee, Superintendence, considerably altered the meaning of this contractual provision.

**61.** In *Oriental Mid-East Lines, Inc., supra,* the Court held that a ship operator did not exercise "reasoned judgment" in failing to heed repeated warnings concerning the possibility of ice closure as the two ships proceeded through the Great Lakes arriving at the lakeward entrance to the Seaway shortly after the Seaway had closed its navigation season due to cold

so, the Court finds that Stevenson did not exercise reasonable judgment in loading the last third of the NEDON cargo on October 17, 1974. (See Finding 90)

5. Accordingly, the Court finds that Stevenson is entitled to its freight against ADM in the amount of $169,316.25.[62] The Court further finds that Stevenson is entitled to the sum of $148,451.00, against ADM for the period of time that the vessel was detained in the Port of Mobile.[63] The Court is of the opinion that Stevenson is not entitled to its claim resulting from the lost Big Lift charter. Therefore, the Court finds that the total sum in damages to be awarded to Stevenson against ADM is $317,-767.25, together with interest at the legal rate of six percent (6%) per annum from the date of this judgment until paid.

## ADM'S COUNTERCLAIM AGAINST STEVENSON AND NEDON

■ 6. ADM's position is that it has standing to recover against Stevenson and the NEDON for damages under Section 2–722 of the Uniform Commercial Code and under general maritime law, *Armco International Corp. v. Rederi A/B Disa*, 151 F.2d 5 (CA2 1945), in that after the inception of this litigation, it filed a provisional claim based on the fact that Bolivia refused to accept the NEDON cargo. Stevenson asserts that ADM has no standing to file a claim to the cargo. Having considered ADM's claim that it has a security interest in the flour under its contract of sale, the Court is of the opinion that ADM is a proper claimant within the meaning of Supplemental Rule C(6) of the Federal Rules of Civil Procedure. 12 C. Wright and A. Miller, Federal Practice and Procedure, Civil § 3223 at 280.

7. In its counterclaim against Stevenson ADM maintains that after the arrival of the flour at the State Docks warehouses, the flour came under the custody and control of Stevenson who was obligated to care for it and that by failing to inspect the flour, loading it into an infested vessel and by failing to fumigate, Stevenson was negligent and is liable to ADM for its damages. *U. S. v. Lykes Bros. Co., Inc.*, 511 F.2d 218 (CA5 1975); *U. S. v. Central Gulf S.S. Corp.*, 321 F.Supp. 945 (E.D.La.1970), aff'd, 456 F.2d 1281 (5 Cir.).

Under COGSA[64] § 3(2), 46 U.S.C.A. § 1303(2), certain obligations are placed on the carrier to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." In the instant case, ADM is not the shipper and had no contractual relationship with Stevenson and therefore, the burden on ADM is to prove negligence by Stevenson in the handling of the cargo if, indeed, ADM has any standing to raise the question.

■ The Court is of the opinion that Stevenson had no responsibility for the condition of the cargo until it was in reach of ship's tackle (COGSA, § 7, TJS Ex. 12) and the evidence supports the finding that the vessel was free of infestation until the flour in question was loaded.

■ 8. As to the ADM claim that Stevenson wrongfully claused the NEDON bill of lading, the evidence shows that certain lots of the flour were infested, and therefore, Stevenson was legally obligated to clause the bill of lading. COGSA § 3(3), 46 U.S.C.A. § 1303(3) ADM challenges the

---

weather. The district court's finding that the ship operator had failed to use reasoned judgment was bottomed largely on the fact that the Seaway had issued several warnings regarding the possibility of an early close of the Seaway which the ship operator did not follow, and therefore, was not able to recover on its shipping contracts for freight.

**62.** 27,658 bags of flour or 1254.56 tons were loaded aboard the NEDON on October 17, 1974. (ADM Ex. 77) 1254 tons multiplied by $60.00 per metric ton equals $75,273.60. The

sum of $75,273.60 is thereby subtracted from the total claim of $244,589.85.

**63.** See note 55, supra.

**64.** The Carriage of Goods by Sea Act (COGSA), 46 U.S.C.A., § 1300, et seq., which governs disputes over ocean-going freights, is incorporated and made applicable to this contract of carriage by virtue of the Booking Note (TJS Ex. 2) and the Bill of Lading (TJS Ex. 11).

wording of the infestation clause that was inserted in the bill of lading and mate's receipts by Stevenson. COGSA 4(2)(m), 46 U.S.C.A. § 1304(2)(m) provides that "[n]either the carrier nor ship shall be responsible for loss or damage arising from—[w]astage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods." Moreover, COGSA § 3(3), 46 U.S.C.A. § 1303(3) requires the carrier to issue the shipper a bill of lading which must show, among other things, "(t)he apparent order and condition of the goods." COGSA § 3(3)(c), 46 U.S.C.A. § 1303(3)(c). The Court is of the opinion that Stevenson's clausing of the bill of lading and mate's receipts was accurate and reasonable.

9. Even assuming that the clausing of the bill of lading was not accurate, the clausing of the bill of lading of the NEDON had no effect on ADM's contract with Bolivia. ADM was not entitled to the bill of lading since Bolivia was the consignee and it was the undisputed testimony that a clean bill of lading was of no importance to ADM.

10. ADM claims that Stevenson wrongfully refused to sail the NEDON from the Port of Mobile and as a result is liable to ADM for its damages. Having considered the testimony, the Court finds that Stevenson deferred the sailing of the NEDON pending a determination of whether its cargo was actually infested. Accordingly, the Court finds no evidence to support such a claim. (See Finding 91)

11. Another argument raised by ADM concerning the carrier's obligation to care for the NEDON cargo is that had Stevenson fumigated and otherwise cared for the flour as Mr. Pyer had recommended on October 19, 1974, and as it was obligated to do, the flour would have been usable for human consumption and could have been sold at a price to cover reconditioning costs and still leave ADM whole.

Admittedly, the carrier has the duty to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." COGSA § 3(2), 46 U.S.C.A.

§ 1303(2); *U. S. v. Lykes,* 511 F.2d 218 at 224. Although the surveyor recommended fumigation of the cargo on October 19, 1974, the carrier (Stevenson), shipper (Bolivia), and the supplier (ADM), ignored this recommendation. All of the parties were advised of the infestation yet no one fumigated the cargo.

The issue presented is whether Stevenson has adequately demonstrated its freedom from negligence in caring for the cargo. Following the rejection of the cargo by Bolivia, the evidence reflects that Stevenson attempted to contact ADM and Bolivia to reach some understanding as to the cargo. Both ADM and Bolivia adhered to a "hands off" policy from October 31, 1974, to November 21, 1974, when Stevenson filed suit.

The evidence shows that Stevenson made "some effort" to offload the cargo but could not find a suitable location. Moreover, besides communicating with ADM and Bolivia, Stevenson attempted to sell the cargo but was unsuccessful. Finally, on November 21, 1974, Stevenson filed its complaint requesting the court to conduct a sale of the NEDON cargo.

Clearly, Stevenson had the authority as well as the duty to sell the flour cargo which was in constant risk of further deterioration. COGSA § 3(2), 46 U.S.C.A. § 1303(2)

The burden is on the carrier to use due care, however, the carrier is not an insurer of the cargo. Having considered the evidence, the Court finds that Stevenson was not negligent in caring for the NEDON cargo. Accordingly, the Court is of the opinion that the costs and expenses incurred by ADM after ADM had posted bond and "reclaiming ownership" of this cargo in December of 1974, are not attributable to Stevenson and therefore ADM cannot recover damages from Stevenson.

## STEVENSON'S CLAIMS AGAINST ADM FOR DAMAGES AND FOR DETENTION OF SOUTHWALL AND ARIZONA

12. Stevenson claims that ADM agreed to pay for the cost of the

fumigation of the SOUTHWALL and ARIZONA. The Court finds that ADM refused to pay for the fumigation expenses and therefore, as there was no agreement, Stevenson is not entitled to recover from ADM for the costs and expenses associated with the fumigation of the vessels. (See findings 60, 61, 62, 63)[65]

■ 13. Stevenson claimed that ADM assured it that the cargoes of the ARIZONA and SOUTHWALL met contract specifications, and Stevenson therefore sailed the vessels and upon arrival in Arica, Chile, Bolivia refused to accept the cargo thereby causing Stevenson to incur damages. The Court finds that Stevenson has failed to sustain its burden of proving that it relied on the assurances of ADM in sailing the ARIZONA–SOUTHWALL cargoes. (See Finding 66) Even assuming that a verbal assurance was in fact made the statement falls within the ambit of Title 20, § 6, Code of Alabama, which provides as follows:

> No action can be maintained to charge any person by reason of any representation or assurance[s] made concerning the character, conduct, ability, trade or dealings of any person, when such action is brought by the person to whom such representation or assurance was made, unless the same is in writing, signed by the party sought to be charged.

Finally, and again assuming that the assurance and reliances alleged by Stevenson were established, the evidence fails to support Stevenson's claims that its damages which are for demurrage and loss of use of the vessels resulted from any assurance or misrepresentation by ADM. To the contrary, the Court is of the opinion that the proximate cause of Stevenson's losses was the refusal by Bolivia as consignee to accept the cargo.

## STEVENSON'S CLAIM AGAINST BOLIVIA FOR DETENTION OF SOUTHWALL AND ARIZONA IN SOUTH AMERICA

■ 14. Stevenson contends that Bolivia acted unreasonably in rejecting the discharge of its own cargo in Arica and thereby delayed the vessels SOUTHWALL and ARIZONA. The Court is of the opinion that the evidence supports such a finding. (See Findings 69, 70, 73, 78, 79)

■ Although the evidence supports the finding that the ARIZONA–SOUTHWALL cargoes contained infestation in Arica, Bolivia had paid for the flour and paid for the freight. As consignee the Ministry had certain obligations, one of which is to discharge the cargo as soon as reasonably practicable after its arrival. It has been held that the arrival of cargo in damaged but not totally useless and valueless condition does not relieve the consignee of the obligation to take delivery of the cargo as required by the terms and conditions of the charter party. *Cargill, Incorporated v. S/S Nasugbu,* 404 F.Supp. 342, 349 (M.D.La. 1975); *Compagnia Di Navigazione Mauritius Rome v. Kulukundis,* 182 F.Supp. 258 (E.D.N.Y.1959), aff'd, 277 F.2d 161 (CA2 1959)[66]

15. Stevenson seeks demurrage, or delay damages, resulting from the Ministry's refusal to accept delivery. As was stated by the court in *Pennsylvania R. R. Co. v. Moore-McCormack Lines, Inc.,* 370 F.2d 430, at 432 (CA2 1966):

> The duty of the consignee of goods transported by a carrier to accept delivery thereof is not ordinarily excused by the fact that the goods are damaged, unless such damage renders the property practically valueless, having regard to the expense of acceptance and use, and to the purpose for which it was intended.
> Miller, *Law of Freight Loss and Damage Claims,* at § 506.1 (1st Ed. 1953).

**65.** An alternate argument raised by Stevenson is that since the infestation originated before loading, the equitable obligation is on the supplier, ADM, to pay for the infested cargo that was allowed to be loaded aboard the vessels by the non-feasance of its appointed inspector, Superintendence. The Court is of the opinion, however, that ADM had no equitable obligation to Stevenson to fumigate the vessels.

**66.** In determining the obligations of a consignee to accept a damaged cargo one writer has stated:

The general rule is that demurrage is extended freight and, where there has been an excess of lay days over those stipulated, the consignee is liable to pay demurrage for those excess days regardless of what brought about the delay except (1) where a specific provision of a charter party exonerates the consignee from liability for demurrage; (2) where the delay is the fault of the carrier or those for whom he is responsible; or (3) where the delay is caused by a vis major.

Additionally, the Stevenson bills of lading and booking notes state that the Embassy of Bolivia is the shipper for the ARIZONA–SOUTHWALL cargoes. An issue to be determined is what obligations, if any, were on the shipper upon being advised of the infestation. Assuming that the argument raised by Bolivia that the Ministry was not properly notified of the infestation found in Mobile and were "kept in the dark" about the infestation is accepted, did the shipper have any available alternatives when the discovery and extent of infestation of the ARIZONA–SOUTHWALL cargoes was first made known to the Ministry in Arica, Chile?

Three alternatives pointed out by the Fifth Circuit Court of Appeals in *U. S. v. Lykes Bros.*, 511 F.2d 218 at 225, when the shipper is immediately advised of the infestation are that:

It could have (1) ignored the situation, hoping to salvage enough of the cargo to make that the most economical alternative, (2) fumigated the cargo, or (3) unload the cargo and attempt to sell it immediately.

Considering the remedies available to the Ministry against ADM, the supplier for flour aboard the SOUTHWALL and ARIZONA, Bolivia as consignee and shipper, should not have under the circumstances rejected the cargoes. Although an accord was eventually reached between Stevenson and the Ministry to discharge the flour cargo in Arica, the delay of twenty-three days was initiated by the Ministry and therefore, the Court is of the opinion that Bolivia is liable for the time spent by the vessels in Arica awaiting discharge.

Accordingly, the Court finds that Stevenson is entitled to recover demurrage from Bolivia for delay of the vessel SOUTHWALL computed from October 14, 1974, to November 5, 1974, when the vessel discharged in Arica. This amounts to $29,-992.00, arrived at by multiplying for 23 days by $1,304.00 per day. (TJS Exs. 58, 97) As to port expenses incurred in Arica during the SOUTHWALL's delay, Stevenson is entitled to recover from Bolivia the amount of $8,084.16. (TJS Ex. 97)

Regarding the claims made by Stevenson as to survey fees and legal expenses incurred in Arica, the Court is of the opinion that there is insufficient evidence to substantiate said claims and therefore Stevenson is not entitled to any recovery of these particular expenses.

Finally, as to the claim of lost profits resulting from the loss of northbound cargo as testified to by Mr. Stevenson, the Court finds no documentary evidence presented to the court as to the terms of this charter or rate of freight. Moreover, no booking note was presented attesting to this contract of carriage. Accordingly, the Court finds that Stevenson has not sustained the burden of proof showing that it is entitled to recover the lost profits claimed herein.

16. The Court further concludes that Stevenson is entitled to recover demurrage from Bolivia for the delay of the vessel ARIZONA computed from October 14, 1974, to November 5, 1974, when the discharging was completed. This amounts to $46,000.00, arrived at by multiplying 23 days by $2,000.00 per day. (TJS Ex. 94)

As to the claims for expenses incurred in the Port of Arica caused by the 23 day delay, the Court finds that Stevenson is entitled to $7,938.66.

As stated above, with regard to the SOUTHWALL, the Court is of the opinion that there is insufficient evidence to support a finding that Stevenson is entitled to recover survey fees and legal expenses incurred in Arica with regard to the vessel

ARIZONA. Accordingly, the Court finds that Stevenson is entitled to damages against Bolivia in the total sum of $92,014.82, together with interest at the legal rate of six percent (6%) per annum from the date of this judgment until paid.

## ADM'S COUNTERCLAIM AGAINST BOLIVIA ON THE NEDON CARGO AND BOLIVIA'S COUNTERCLAIM AGAINST ADM FOR BREACH OF CONTRACT

17. In seeking to recover damages against Bolivia in the amount of $644,140.23, ADM's theory is that it complied with the terms of its contract of sale to deliver flour of certain specifications "F.A.S. Port of Mobile for Export", and that in refusing to accept the NEDON cargo, Bolivia breached its contract with ADM. In response Bolivia argues that ADM is not entitled to recover from the Ministry on its claim for damages based upon the Ministry's failure of payment to ADM for the purchase price of the flour loaded aboard the NEDON in that ADM breached its contract in that some of the flour was infested when it arrived at the Alabama State Docks warehouses and therefore, not of merchantable quality. Bolivia further argues that in addition to the breach of its express warranty of merchantability, ADM committed a separate breach of another express warranty contained in the contract in violation of the Federal Food, Drug and Cosmetic Act. In short, the Ministry asserts it had the right to reject the entire NEDON cargo. Moreover, the Ministry's position in its counterclaim against ADM is that the flour aboard the ARIZONA and SOUTHWALL was not of merchantable quality at the time of delivery by ADM and therefore although the Ministry had accepted the non-conforming flour it is entitled under the Uniform Commercial Code to recover its damages.

18. The choice of law provision regarding both contracts for the purchase of 28,618 metric tons of wheat flour between ADM and Bolivia is identical and requires that the contracts' construction and performance be determined under Illinois law.[67]

19. ADM warrants on the face of its contract "that the product sold shall be of merchantable quality". The statute governing this question is Section 2-314(2)(c) of the Uniform Commercial Code[68] which provides in part as follows:

(2) Goods to be merchantable must be at least such as . . . .

(c) are fit for the ordinary purposes for which such goods are used; . . . .

Bolivia contends that ADM breached said contracts in that some of the flour was infested when it arrived at the State Docks and thereby not of merchantable quality. Clearly, if wheat flour found to be infested with beetles would have passed the above test without objection, there would have been no need for the flour to have been fumigated in the warehouse in Mobile. The Court finds that some of the flour loaded aboard the NEDON was infested when it arrived at the State Docks warehouses and not in compliance with the warranty of merchantability, Section 2-314. (See Bol. Ex. 10)

20. ADM further warranted that the flour would meet all applicable provisions of the Federal Food, Drug and Cosmetic Act. Bolivia contends that ADM breached its contract in that some of the flour which was stored in the No. 1 hold of the NEDON, was infested to such an extent when it arrived at the State Docks warehouses that it did not meet the applicable guidelines established by the Food, Drug and Cosmetic Act.[69]

---

67. The relevant contract provision is set out at note 3, supra.

68. As has been seen, the choice of law provision found in both contracts refers the court to Illinois law. See note 3, supra. Illinois has adopted Section 2-314(2)(c) without change. Ill.Stat.Ann. ch. 26, § 2-314(2)(c).

69. Chapter 9, 21 U.S.C.A § 301, et seq., especially subchapter III, concerns itself with criminal acts and penalties and therefore the cases dealing with the statutes involved herein focus primarily on whether or not the defendant has violated it for criminal purposes and not whether the defendant has lived up to a certain contractual provision.

21. 21 U.S.C.A. § 342(a)(3) provides that a food is judged adulterated "if it consists in whole or in part of any filthy, putrid or decomposed substance, or if it is otherwise unfit for food." Clearly, wheat flour is food under this statute. 21 U.S.C.A. § 321(f).

It has been held that flour beetles constitute "filth" within the meaning of 21 U.S.C.A. § 342. *United States of America v. Cassaro, Inc.,* 443 F.2d 153 (CA1 1971)[70]. It would seem that the First Circuit Court of Appeals in *Cassaro, supra,* interprets § 342 to be that if a food such as flour is filthy, due to beetles, it could be deemed adulterated even though it was fit for human consumption.

The Court of Appeals for the Fifth Circuit provides us with an interpretation of 21 U.S.C.A. § 342(a)(3) in the case of *United States of America v. 484 Bags, More or Less,* 423 F.2d 839 (CA5 1970). As was noted by the Fifth Circuit:

21 U.S.C.A. § 342(a)(3) provides that a food is deemed adulterated "if it consists in whole or in part of any filthy, putrid or decomposed substance, or if it is otherwise unfit for food". The District Court read the first clause of the quoted provision as being elucidated by the second so that the amount of decomposition made unlawful thereby is that "which would, with reasonable certainty, render the article unfit for food." *U. S. v. 484 Bags, More or Less, Etc.,* 297 F.Supp. 672 at 673 (D.C.). This court along with others, has

long held that the two clauses are independent and complementary, so that a food substance may be condemned as decomposed, filthy, or putrid even though it is not unfit for food. *Bruce's Juices v. United States,* 194 F.2d 935 (5th Cir. 1952); *Salamonie Packing Co. v. United States,* 165 F.2d 205 (8th Cir.), cert. denied, 333 U.S. 863, 68 S.Ct. 744, 92 L.Ed. 1142 (1948); *United States v. 449 Cases, Etc.,* 212 F.2d 567 (2d Cir. 1954); *United States v. 1851 Cartons, Etc.,* 146 F.2d 760 (10th Cir. 1945), or condemned as unfit for food even though not decomposed, filthy or putrid, *United States v. 24 Cases, Etc.,* 87 F.Supp. 826 (D.Me.1949). The single case relied upon by the District Court, *United States v. 1500 Cases, Etc.,* 236 F.2d 208 (7th Cir. 1956), adopts the accepted interpretation reached in the above-cited cases, albeit reluctantly. Thus the District Court's finding that the beans were not unfit for food does not preclude condemnation of them as adulterated.

*United States of America v. 484 Bags More or Less,* 423 F.2d 839, 840–841 (CA5 1970); see *United States v. Central Gulf Steamship Corp.,* 321 F.2d 945, 951 (E.D.La. 1970), aff'd 456 F.2d 1281 (CA5 1972).

Apparently, the rule to be derived from *484 Bags, More or Less, supra,* is that the Pure Food and Drug Act confers the power to exclude all food products which

---

21 U.S.C.A. § 331 provided in relevant part: The following acts and the causing thereof are prohibited:
(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded.
Nevertheless, when a party in its contract adopts compliance with the Federal Food, Drug and Cosmetic Act as part of its warranty, the standards of the Act become the standards of the warranty. The relevant contract provision is set out at note 3, supra.

**70.** In relevant part, the *Cassaro* opinion reads as follows:
Defendants' contention that flour beetles cannot be considered 'filth' under § 342, see note 2 supra, is wholly without merit. In-

sects and larvae fragments have been held to constitute 'filth' in numerous cases, e. g., *Golden Grain Macaroni Co. v. United States,* 209 F.2d 166, 167–168 (9th Cir. 1953). 'Congress intended that the word 'filthy' as used in the Act, should be construed to have its usual ordinary meaning.' *United States v. Swift & Co.,* 53 F.Supp. 1018, 1020 (M.D.Ga. 1943). In light of the legislative history discussed supra, we see no reason to read into the statute a requirement that the adulteration be proven injurious to health; consumers have no more desire to eat insect fragments—no matter how harmless—than any other foreign matter.
*United States of America v. Cassaro, Inc.,* 443 F.2d 153, 156 (CA1 1971).

contain in any degree filthy, putrid, or decomposed substances.[71]

■ 22. Applying these standards to the facts in the instant case, the Court finds that the NEDON cargo was not of merchantable quality. The Court further finds that the flour in Hold No. 1 of the NEDON was adulterated and therefore did not meet the applicable guidelines established under § 342. Accordingly, the Court is of the opinion that under Section 2–601 [72] of the Uniform Commercial Code, the Ministry had the right to reject the entire NEDON cargo on October 31, 1974, and therefore is not liable to ADM for the purchase price of such flour or for any consequential damages sustained by ADM subsequent to October 31, 1974.

23. With regard to Bolivia's claim against ADM for damages to the ARIZONA and SOUTHWALL cargoes, the evidence establishes that these cargoes were not of merchantable quality at the time of delivery by ADM, but since the Ministry had paid for the flour and ultimately accepted such non-conforming cargo, the Ministry is entitled to its damages under Section 2–606 of the Uniform Commercial Code.[73] However, ADM asserts that Bolivia is barred from asserting such a claim in

that it failed to comply with the notice requirements of the contract [74] and secondly, that Bolivia failed to give adequate notice under Section 2–607(3)(a) of the Uniform Commercial Code which provides in part as follows:

(3) Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy

. . . .

■ As to the claim that Bolivia breached its contract by failing to give notice to ADM, the evidence discloses that the Ministry did not give notice by registered mail specifying the nature of the complaint. Moreover, the Ministry forwarded no sample of the non-conforming cargo as required in its contract with ADM. However, the evidence establishes that the Ministry gave ADM warning of the nature of its dissatisfaction with the ARIZONA–SOUTHWALL cargoes. (See Findings 58, 59) Without a lengthy review of the facts in this complex case, suffice it to say, that the Ministry requested information from ADM about the problems of infestation, yet ADM's reply was that it was continuing to send good clean flour. Having considered the evi-

---

71. Although the Fifth Circuit reads § 342(a)(3) as all inclusive it acknowledges that if strictly enforced such a standard "would ban all processed food from interstate commerce." Therefore, this harshness is tempered by the discretion given to Congress through the Secretary of Health, Education and Welfare to make regulations establishing that there be certain tolerances for exemptions under 21 U.S.C.A. § 346. Nevertheless, under the established standards set forth by the Fifth Circuit it seems that § 346 would not be applicable to filthy, putrid or decomposed substances. See *United States of America v. 484 Bags, More or Less*, 423 F.2d 839, 842 (CA 5 1970).

72. Section 2–601 provides:
Subject to the provisions of this Article on breach in installment contracts (section 2 - 612) and unless otherwise agreed under the sections on contractual limitations of remedy (sections 2–718 and 2–719), if the goods or the tender of the delivery fail in any respect to conform to the contract, the buyer may
(a) reject the whole; or
(b) accept the whole; or

(c) accept any commercial unit or units and reject the rest.
Illinois has adopted section 2–601 without change. Ill.Stat.Ann. ch. 26, § 2–601.

73. Section 2–606 reads as follows:
(1) *Acceptance of goods occurs when the buyer (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity*; or (b) fails to make an effective rejection (subsection (1) of section 2–602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.
(2) Acceptance of a part of any commercial unit is acceptance of that entire unit. (Emphasis added)
See Ill.Stat.Ann. ch. 26, § 2–606

74. The relevant contract provisions are set out in note 3, supra.

dence, the Court finds that the Ministry is not barred from presenting its claim under the notice provision of the contract.

Similarly, the Court is of the opinion that the Ministry gave ADM adequate notice under Section 2–607(3)(a). Pre-U.C.C. decisions in Illinois recognized that notification to the seller is an integral part of a buyer's cause of action and is not an affirmative defense of the seller. Consequently, the buyer must plead and prove that the notice requirement [75] had been complied with. *Carey v. I. J. Kayle & Associates*, 1970, 122 Ill.App.2d 403, 259 N.E.2d 304; 2 R. Anderson, Uniform Commercial Code, § 2–607–22–23 (1971). Although notification under Section 2–607(3)(a) is a mandatory obligation, "notice under section 2–607 need not be a specific claim for damages or an assertion of legal rights." *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 976 (CA 5 1976), 2 R. Anderson, Uniform Commercial Code § 2–607–25 at 218 (1971). A purpose of section 2–607 notice requirement is to inform the seller that his tender is non-conforming, but also to open the way for settlement through negotiations between the parties. Official comment 4 to section 2–607.

Bolivia asserts that to give ADM notice of a breach which is apparent to both parties is tantamount to a "useless gesture." *Jay V. Zimmerman Company v. General Mills, Inc.*, 327 F.Supp. 1198, 1204 (E.D.Mo. 1971). In determining what is adequate notice, it has been held that no particular words must be used to constitute an adequate form of notice. *Overland Bond & Investment Corp. v. Howard*, 9 Ill.App.3d 348, 358–359, 292 N.E.2d 168 (1st Dist. 1972); J. White & R. Summers, Handbook

of the Law under the Uniform Commercial Code 347–348 (1972); see R. Nordstrom, Handbook of the Law of Sales 430 (1973). Having considered the evidence, the Court is of the opinion that the facts are sufficient to find that Bolivia gave adequate notice under 2–607(3)(a) to ADM, and therefore is not barred from making any claim for damages as to the non-conforming flour cargo.

24. Finally, ADM argues that even if Bolivia was entitled to damages on the SOUTHWALL and ARIZONA cargoes there can be no recovery as there is complete lack of evidence as to the value of the goods in their actual condition in Mobile, Alabama, in that Bolivia's measure of damages for breach of warranty is the difference between the value of the flour at the time and place of acceptance (Mobile) and the value they would have had if they had been in the condition warranted in the contract. The statute governing this question is Section 2–714(2),[76] which provides in part as follows:

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

Bolivia's theory of damages (Bol. Ex. 47) is based on the premise that Bolivia had no reasonable opportunity to inspect the cargo in Mobile and therefore the damages should be based on the official wholesale price of such flour established by the Republic of Bolivia.[77]

---

**75.** The statute in effect at the time, now superseded by the Commercial Code, was § 49 of the Uniform Sales Act (Ill.Rev.Stat.1961, ch. 121½, § 49) which read:

In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable

time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor. See Ill.Stat.Ann. ch. 26, § 2–607.

**76.** Illinois has adopted Section 2–714(2) without change. Ill.Stat.Ann. ch. 26, § 2–714(2).

**77.** The Ministry claims that although the total cost per 100-pound bag of flour at the time such flour arrived in Bolivia was approximately $17.00, the official wholesale price of such flour fixed by the Republic of Bolivia was only $14.7059 per bag in La Paz and Oruro, and $14.9388 per bag in Cochabamba, Bolivia.

130

Having considered the matter, the Court finds that the Ministry having accepted the non-conforming flour aboard the ARIZONA and SOUTHWALL is entitled to damages against ADM in the amount of $325,960.51, together with interest at the legal rate of six percent (6%) per annum from the date of this judgment until paid.

Each of the parties shall bear its own costs and attorneys' fees.

Judgments in accordance herewith will be entered.

## APPENDIX "A"

A & P Termite and Pest Control Company, Mobile Flour fumigator.

ADM Mill, owned and operated by ADM.

ADM, miller and supplier of the flour in question.

American Home Insurance Company, Bolivia's underwriter, inspected the SOUTHWALL and ARIZONA cargoes in Arica.

Armour, Reese, head of Operations for Page & Jones.

Atlantic and Gulf Stevedores, employed by Page & Jones at the instance of Stevenson.

Barry, Captain Jim, marine surveyor employed by Stevenson to inspect the NEDON.

Battcock, Norman, surveyor for National Cargo Bureau, employed by Stevenson to inspect the NEDON.

Bolivia, Republic of, purchaser of the flour in question.

Bradshaw, Thomas A., LaMorte Burns employee.

Christensen, Edith, Director, Beltsville, Maryland USDA Laboratory.

Claure, Oscar, Bolivian Customs Agent in Arica.

The best wholesale price obtainable by the Ministry for the infested flour in Bolivia was $12.7206 in La Paz and Oruro and $12.9221 in Cochabamba. Therefore, the Ministry contends that it is entitled to recover the difference between the price for good flour and the price for infested flour. Since the Ministry's national plan of supply had allocated 64,872 bags to La

Cleveland, Danny, employed by T. A. Provence and Company.

Crismon, Al, head of Traffic for Page & Jones.

D. F. Young and Company, ADM's foreign freight forwarder.

Dowling, James, Claims Manager for Stevenson.

Dunmire, Ron, inspector for Superintendence.

Dvorak, Mildred, employee of St. John International.

Ellis, Ivan, vice-president of Operations for Stevenson.

Gooch Milling Company, owned and operated by ADM.

Harris, Kenton L., entomologist, employee of O. D. Kurtz and Associates, hired by ADM.

Hope, Robert, Director, Alabama State Docks.

Hurd, Al, A&P Termite and Pest Control Company employee, Mobile.

International Multifoods Mill, Blackwell, Oklahoma, independent flour mill.

International Multifoods, North Kansas City, Missouri, independent flour mill.

Kearns, Joseph, president, D. F. Young and Company.

LaMorte Burns, Steamship Mutual's American correspondent.

Landivar, Heran, Sub-secretary, Bolivia.

Litton, John, entomologist, employed by USDA.

Loria, Juan, Minister, later Chargé d'Affaires, Bolivian Embassy, Washington, D. C.

McHugh, Noel, vice-president of St. John International.

Paz, 54,990 bags to Cochabamba and 5,330 bags to Oruro, the Ministry could have obtained $1,603,597.84. Accordingly, the Ministry's damages are $250,270.36. (Bol. Exs. 46, 47).

In addition to said sum of $250,270.36, the Ministry is entitled to recover $75,690.15 for the additional expenses incurred due to the infestation of the flour. (Bol. Exs. 48, 49, 51).

Ministry of Industry, Commerce and Tourism, Republic of Bolivia.

Mino, Eduardo, owner, American Home Insurance Company.

Nelson, Harold, pest control expert, Alabama State Docks.

O'Keene Milling Company, independent flour mill.

Page & Jones, Inc., Mobile steamship agent employed by Stevenson.

Patrick, Kenny, employee of Atlantic and Gulf Stevedores.

Perfect Lambert and Company, London surveyors for Steamship Mutual.

Pinell, Gonzalo, representative of Securit International.

Pyer, Michael, independent surveyor hired by Stevenson's underwriters.

Quiroga, Marcello, Bolivian AADAA.

Richards, Tom, employee of Alabama State Docks.

Saenz, Luis Pancheco, representative, American Home Insurance Company.

Sanford, Marlin, field officer, USDA, Mobile.

Saurez, Adriano, Bolivian representative in La Paz.

Securit International, independent salvage company, La Paz, Bolivia.

Shawnee Milling Company, independent flour mill.

Smith, Walter, employee of Superintendence.

Smith, Captain M.C., National Cargo Bureau surveyor employed by Stevenson to inspect the NEDON.

St. John International, Inc., steamship broker representing Bolivia.

Steamship Mutual, Stevenson's underwriters.

Stevenson, Thomas J., president of T. J. Stevenson & Company.

Stoa, Gordon, vice-president of ADM.

Stuart, Leslie, owner, T. A. Provence.

Superintendence, Inc., ADM's appointee to sample, test and weigh the flour at Mobile.

T. A. Provence and Company, Mobile freight forwarding company hired by D. F. Young for ADM.

T. J. Stevenson & Company, Inc., steamship agency employed by Bolivia to transport the flour from Mobile to Chile.

Ultramar, Stevenson's agent in Arica.

Valencia, General Edmondo, Bolivian Ambassador to the U.S.

van Aken, John, Lloyds surveyor employed at Mobile by ADM to inspect NEDON.

Western Star Milling Company, an ADM mill.

Zortman, Robert A., field officer, USDA, Mobile.

## JUDGMENT

This cause having come on for final hearing on the pleadings and proof and having been taken under submission, the Court after due deliberation having entered its Findings of Fact and Conclusions of Law, it is ORDERED, ADJUDGED and DECREED that a judgment in the amount of THREE HUNDRED TEN THOUSAND, SIXTY-SEVEN AND 25/100 DOLLARS ($310,-067.25) be, and the same is entered in favor of T. J. Stevenson & Company, Inc., against ADM Milling Company, Inc., together with interest at the rate of six percent (6%) per annum from the date of this judgment until paid.

It is FURTHER ORDERED, ADJUDGED and DECREED by the Court that a judgment in the amount of NINETY-TWO THOUSAND, FOURTEEN AND 82/100 DOLLARS ($92,014.82) be, and the same hereby is entered in favor of T. J. Stevenson & Company, Inc., against the Republic of Bolivia, together with interest at the rate of six percent (6%) per annum from the date of this judgment until paid.

It is FURTHER ORDERED, ADJUDGED and DECREED that a judgment in the amount of THREE HUNDRED TWENTY-FIVE THOUSAND, NINE HUNDRED SIXTY AND 51/100 DOLLARS ($325,960.51), be and the same hereby

132

is, entered in favor of the Republic of Bolivia against ADM Milling Company, Inc., together with interest at the rate of six percent (6%) per annum from the date of this judgment until paid.

Each of the parties shall bear its own costs and attorneys' fees.

